790 A.2d 884

RUDOLPH LAIDLOW AND JEAN LAIDLOW, PLAINTIFFS-APPELLANTS, v. HARITON MACHINERY COMPANY, INC., DEFENDANT, AND RICHARD PORTMAN AND ADVANCED METALLURGY AMI–DDC INC., A DIVISION OF TECHNITROL, DEFENDANTS RESPONDENTS, AND JAY HILL INDUSTRIES, INC., UNITED ENGINEERING AND FOUNDRY CO., INC., ART WIRE/DODUCO, UESC INC., WEAN INC., BARTO INC., UNITED ENGINEERING INC., UNITED FOUNDRY INC., DANIELI UNITED, A DIVISION OF UNITED FOUNDRY INC., JOSEPH YASENKA, INDIVIDUALLY AND T/A JAY HILL INDUSTRIES, JAY HILL INDUSTRIES, AN UNINCORPORATED ENTITY, AA CO., INC., BB CO., INC., CC CO., INC., DD CO., INC., SAID NAMES BEING FICTITIOUS; JOHN DOE, RICHARD ROE, RICHARD DOE AND JOHN ROE, SAID NAMES BEING FICTITIOUS, DEFENDANTS.

Argued November 5, 2001—Decided February 25, 2002.

604

*Kenneth J. Fost* argued the cause for appellants (*Fost, Muscio & Caruso*, attorneys).

*Kenneth E. Pogash* argued the cause for respondent AMI–DDC, Inc. (*Guida, Fabricant & Bressler*, attorneys).

*John J. Murphy, III*, argued the cause for respondent Richard Portman (*Stradley Ronon Stevens & Young*, attorneys; *Mr. Murphy* and *Francis X. Manning*, on the brief).

*Michael A. Galpern* submitted a brief on behalf of amicus curiae Association of Trial Lawyers of America–New Jersey Chapter (*Greitzer and Locks*, attorneys; *Mr. Galpern* and *Margaret M. Allen*, of counsel and on the brief).

*Michael J. Marone* submitted a brief on behalf of amicus curiae New Jersey Manufacturers Insurance Companies (*McElroy, Deutsch & Mulvaney*, attorneys; *Mr. Marone* and *Richard J. Williams, Jr.*, of counsel and on the briefs).

The opinion of the court was delivered by

LONG, J.

The Workers' Compensation system has been described as an historic "trade-off" whereby employees relinquish their right to pursue common-law remedies in exchange for prompt and automatic entitlement to benefits for work-related injuries. *Millison v. E.I. du Pont de Nemours & Co.*, 101 *N.J.* 161, 174, 501 *A.*2d 505 (1985). That characterization is only broadly accurate. In fact, not every worker injured on the job receives compensation benefits and not all conduct by an employer is immune from common-law suit. The Legislature has declared that certain types of

conduct by the employer and the employee will render the Workers' Compensation bargain a nullity. Thus, for example, a worker whose death or injury is "intentionally" self-inflicted or results from a "willful" failure to make use of a safety device, furnished and required by the employer, will be ineligible for benefits. *N.J.S.A.* 34:15–7; *Akef v. BASF Corp.*, 140 *N.J.* 408, 412–413, 658 *A.*2d 1252 (1995). Likewise, an employer who causes the death or injury of an employee by committing an "intentional wrong" will not be insulated from common-law suit. *N.J.S.A.* 34:15–8; *Millison, supra*, 101 *N.J.* at 169, 501 *A.*2d 505.

██ The described limitations involve intentional wrongful conduct committed either by the worker or the employer. Underlying those limitations is the idea that such conduct neither constitutes "a natural risk of" nor "arises out of" the employment, the very notions at the heart of the Workers' Compensation bargain in the first instance. *See generally Modern Workers Compensation*, § 102.20 (2001).

The focus of this appeal is conduct by an employer that is alleged to constitute an intentional wrong under *N.J.S.A.* 34:15–8. We are called on to revisit our holding in *Millison*; resolve conflicting interpretations of it; and apply that decision to a case in which an injured employee claims that his employer has removed a safety device from a dangerous machine, knowing that the removal was substantially certain to result in injury to its workers and, in addition, deliberately and systematically deceived safety inspectors into believing that the machine was properly guarded. We hold that, in those circumstances, the employee's allegations, if proven, meet both the conduct and context prongs of *Millison*, thus entitling the employee to pursue his common-law remedies.

I

Rudolph Laidlow (Laidlow) suffered a serious and debilitating injury when his hand became caught in a rolling mill he was operating at his place of employment, AMI–DDC, Inc. (AMI).

Laidlow sustained a crush and degloving injury resulting in partial amputations of the index, middle, ring and small fingers of his dominant left hand. Laidlow sued AMI on an intentional tort theory. He also named his supervisor, Richard Portman (Portman), in the suit for discovery purposes. AMI answered, denying the allegations of the complaint, and moved for summary judgment on the basis of the Workers' Compensation bar.

Under *Rule* 4:46–2, a movant will be granted summary judgment if the court finds, after reviewing the full motion record in the light most favorable to the adverse party, that there is no genuine issue of material fact. *Brill v. Guardian Life Insurance Company of America*, 142 *N.J.* 520, 536, 666 *A.2d* 146 (1995). It is with that standard in mind that we view the facts presented on AMI's motion.

AMI is in the business of manufacturing electrical products. Laidlow has been employed by AMI since August 7, 1978. On December 11, 1992, Laidlow was performing his job as a "set up man," which required him to work with a rolling mill that changed the dimension of heated metal bars when they were inserted into the mill. Laidlow manually inserted the bars into a "channel" that guided them into the mill, and often had to apply pressure to the bars with his hand in order to feed them into the rollers. On the day of the accident, Laidlow's glove became caught by the unguarded nip point as he was pushing a bar of silver into the channel. His gloved hand was pulled toward the mill's rollers. An eyewitness, Laidlow's co-worker Steven Smozanek, described the incident as follows: "The rollers are approximately 18 inches in diameter, and as he was feeding the bar into the roller, it pulled his hand against the roller, not into the roller, and as it pulled the hand against the roller, it just ripped the glove and the skin right off his hand."

On a prior occasion, Laidlow's glove had also become hooked on a bar, but he was able to slip his hand out of the glove before it was pulled into the machine. Smozanek described a similar incident when he was working on the mill and his gloved hand had snagged on a bar, but he too was able to pull his hand out of the

glove just in time to escape injury. Those close calls were reported to AMI.

After the rolling mill was purchased by AMI in 1978, the company arranged to have a safety guard installed. However, the safety guard was "never" engaged; from 1979 to the date of Laidlow's accident in 1992, the guard always was "tied up." According to Laidlow, the guard was placed in its proper position only when Occupational Safety and Health Administration (OSHA) inspectors came to the plant. On those occasions, Portman, Laidlow's supervisor, would instruct employees to release the wire that was holding up the safety guard. As soon as the OSHA inspectors left, the safety guard would again be disabled.

Laidlow operated the mill without the safety guard in place for approximately twelve to thirteen years. During that period, except for the "near misses" referred to earlier, there were apparently no accidents with the mill until Laidlow was seriously injured during the incident at issue here.

Laidlow spoke to Portman regarding the safety guard three times during the period immediately preceding his accident. Approximately two weeks prior to the accident, Laidlow asked Portman to restore the guard. Several weeks before that, he spoke to Portman because a new operator was going to work on the mill and Laidlow thought the guard should be restored to its operative position. Additionally, one week before the incident, Laidlow again expressed concern that a new, inexperienced operator would be working on the mill, and told Portman that it was dangerous not to use the guard. According to Laidlow, the guard was never restored. Portman responded to his requests by stating that "it was okay" and "not a problem," and by "walk[ing] away." Laidlow never refused to operate the mill without the safety guard in place nor spoke with any other superior in the company about the safety guard.

AMI concedes that the guard was removed for "speed and convenience." In addition, Gerald Barnes, a professional engineer retained by Laidlow, certified that AMI "knew there was a virtual

certainty of injury to Mr. Laidlow or a fellow work[er] arising from the operation of the mill without a guard."

On those facts, the trial court concluded that Laidlow failed to demonstrate an "intentional wrong" under *N.J.S.A.* 34:15–8 and that Workers' Compensation was his exclusive remedy. Accordingly, the trial court granted AMI's motion for summary judgment, along with a similar motion filed by Portman.

The Appellate Division affirmed the dismissals, concluding that there was no evidence of an intentional wrong by AMI to warrant an exception from the Workers' Compensation bar. *Laidlow v. Hariton Machinery Co., Inc.*, 335 *N.J.Super.* 330, 762 *A.*2d 311 (2000). The panel relied on the lack of any accident over a twelve-year period and determined that OSHA violations alone, in the absence of proof of deliberate intent to injure, would not satisfy the intentional wrong standard. The court dismissed the suit against Portman because Laidlow failed to demonstrate any need to pursue discovery. *Id.* at 343, 762 *A.*2d 311.

Judge Lintner dissented, contending that the record, fairly read, presented a jury issue regarding intentional wrong; that the lack of injuries over the twelve-year period was not dispositive of the issue of substantial certainty of injury; that, coupled with the guard's removal, AMI's deceptive practices with regard to OSHA provided conclusive evidence of "context" under *Millison;* and that Laidlow should have been allowed to obtain discovery from Portman because Portman was in a unique position to provide evidence of what the employer knew. *Id.* at 347–49, 762 *A.*2d 311.

The appeal is before us as of right under *Rule* 2:2–1(a)(2) based on the dissenting opinion below. We granted Amicus status to the Trial Lawyers of America (ATLA–NJ) and New Jersey Manufacturer's Insurance Company (NJM).

## II

In essence, Laidlow's argument is that the combination of the employer's disabling of the safety guard and deception of OSHA presents a triable issue on whether such conduct meets the

definition of an "intentional wrong." AMI counters that, under *Millison*, an intentional wrong requires a "deliberate intention to injure" and that Laidlow concedes that no one at AMI harbored such an intention. AMI also maintains that *Millison* specifically declared that the removal of a safety device fails to meet the intentional wrong standard. To the extent that recent Appellate Division decisions, particularly *Mabee v. Borden, Inc.*, 316 N.J.Super. 218, 720 A.2d 342 (1998), suggest the contrary, AMI argues that those cases should be disapproved. Furthermore, AMI argues that even if removal of a safety guard could qualify in some circumstances as an intentional wrong, the absence of any prior injury on its machine and Laidlow's successful experience in operating the machine without an accident for over twelve years obviates that possibility in this case.

NJM supports AMI's position that, under *Millison*, the standard for an intentional wrong requires proof of an employer's subjective intent to injure and that the deliberate removal or alteration of a safety guard does not constitute a "deliberate intent to injure." NJM also claims that the OSHA violations are legally irrelevant under *Millison*.

The heart of ATLA–NJ's position is that AMI and NJM totally mischaracterize *Millison*. ATLA contends that *Millison* specifically rejected the notion that an intentional wrong requires a deliberate intent to injure on the part of the employer; that *Millison* never declared that removal of a safety device failed to meet the standard for an intentional wrong; that *Mabee* correctly recognized that removal of a safety guard can satisfy the intentional wrong standard; that the Appellate Division's reliance on the lack of prior accidents on the mill machine allows for "one free injury" contrary to our public policy; and that there is a jury question regarding whether the employer's actions constituted an intentional wrong.

## III

Our decision in *Millison* is obviously at the root of this case and a review of our holding there is essential. In *Millison*, we were

faced with the question of "what categories of employer conduct will be sufficiently flagrant so as to constitute an 'intentional wrong,' thereby entitling a plaintiff to avoid the 'exclusivity' bar of *N.J.S.A.* 34:15–8?" *Millison, supra,* 101 *N.J.* at 176, 501 *A.*2d 505. That statute reads:

> Such agreement shall be a surrender by the parties thereto of their rights to any other method, form or amount of compensation or determination thereof than as provided in this article and an acceptance of all the provisions of this article, and shall bind the employee and for compensation for the employee's death shall bind the employee's personal representatives, surviving spouse and next of kin, as well as the employer, and those conducting the employer's business during bankruptcy or insolvency.
>
> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.
>
> [*N.J.S.A.* 34:15–8]

That is the so-called exclusive remedy provision of the Workers' Compensation Act, often referred to as the Workers' Compensation bar. *Millison* confronted that provision in the context of an occupational disease caused by exposure to asbestos during employment.

The appeal in *Millison* challenged a trial court's grant of summary judgment to an employer based on *N.J.S.A.* 34:15–8 in connection with plaintiffs' claim that the employer knowingly exposed them to an occupational disease. That court simultaneously denied summary judgment to the company doctors with respect to whom plaintiffs alleged the fraudulent concealment of their asbestos-related diseases. The Appellate Division affirmed the grant of summary judgment to the employer and reversed the denial of summary judgment to the physicians because there was no evidence that they "deliberately intended" to injure the workers.

We granted plaintiffs' petition for certification. Before us, plaintiffs argued that "their charges that defendants knowingly and deliberately exposed employees to a hazardous work environment and fraudulently concealed existing occupational diseases are sufficient to fall within the Act's limited 'intentional wrong' excep-

tion and to take their injuries outside the intended scope of the Compensation Act." *Millison, supra,* 101 *N.J.* at 170, 501 *A.*2d 505.

In addressing that contention, we recounted the history of the intentional wrong exception that had led the Appellate Division to its conclusion that only an employer's deliberate intent to injure was sufficient to vault the exclusivity bar. We also identified the precedents underlying the Appellate Division's ruling:

> *Bryan v. Jeffers,* 103 *N.J.Super.* 522, 523–24, 248 *A.*2d 129 (App.Div.1968) certif. den., 53 *N.J.* 581, 252 *A.*2d 157 (1969) (intentional wrong in compensation statute means "deliberate intention" and is not equatable with gross negligence or similar concepts importing constructive intent); *Arcell v. Ashland Chem. Co.,* 152 *N.J.Super.* 471, 495–96, 378 *A.*2d 53 (Law Div.1977) (allegations of willfully and wantonly failing to undertake known safety and health procedures for protection of employees, and negotiating with governmental bodies so that contemplated implementation of such procedures would be ignored or delayed, are insufficient to satisfy intentional-wrong standard); *Copeland v. Johns–Manville Prods. Corp.,* 492 *F.Supp.* 498 (D.N.J.1980) (*Bryan* requires that "intentional wrong" exception be given a narrow construction; allegations that employer, aware of dangerous working conditions, maliciously and willfully exposed workers to hazardous asbestos products and intentionally withheld information concerning the health risks do not meet the standard for intentional wrong); *Petruska v. Johns–Manville,* 83 *F.R.D.* 39 (E.D.Pa.1979) (claims of intentionally allowing defendant to be exposed to asbestos and failing to warn of known health hazards of asbestos do not meet New Jersey Workers' Compensation Act's strict definition of intentional wrong, which requires deliberate intention to injure).
>
> [*Id.* at 170–71, 501 *A.*2d 505.]

We recognized that those cases traced their rationale to Professor Larson's narrow and limited approach to intentional wrong and quoted extensively from his treatise. Specifically, we cited the following section:

> Even if the alleged conduct goes beyond aggravated negligence, and includes such elements as knowingly permitting a hazardous work condition to exist, knowingly ordering claimant to perform an extremely dangerous job, willfully failing to furnish a safe place to work, or even willfully and unlawfully violating a safety statute, this still falls shorts of the kind of actual intention to injure that robs the injury of accidental character.

> \* \* \*

> If these decisions seem rather strict, one must remind oneself that what is being tested here is not the degree of gravity or depravity of the employer's conduct, but

rather the narrow issue of intentional versus accidental quality of the precise event producing injury. *The intentional removal of a safety device or toleration of a dangerous condition may or may not set the stage for an accidental injury later. But in any normal use of the words, it cannot be said, if such an injury does happen, that this was deliberate infliction of harm comparable to an intentional left jab to the chin.*

[*Id.* at 171 (2A A. Larson, *The Law of Workmen's Compensation* § 68.13 at 13-22 to 13-27 (1983) (footnotes omitted) (emphasis added)).]

What is critical, and what often has been misunderstood, is that we cited Professor Larson and the cases relying on his approach for informational, not precedential, purposes. *Millison,* in fact, specifically rejected Professor Larson's thesis that in order to obtain redress outside the Workers' Compensation Act an employee must prove that the employer subjectively desired to harm him. In place of Larson's theory, we adopted Dean Prosser's broader approach to the concept of intentional wrong.

Under Prosser's approach, an intentional wrong is not limited to actions taken with a subjective desire to harm, but also includes instances where an employer knows that the consequences of those acts are substantially certain to result in such harm. *See* W. Prosser and W. Keeton, *The Law of Torts,* § 80 at 569 (5th ed.1984). In accordance with that view, we cited approvingly to the *Restatement (Second) of Torts* § 8A, which provides, in part:

All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead he is treated by the law as if he had in fact desired to produce the result.[1]

[Restatement (Second) of Torts § 8A.]

---

[1] The most recent draft of the *Restatement (Third) of Torts* § 1 (Tentative Draft No. 1, 2001) has "unblended" the definition of intent and now provides:

An actor's causation of harm is intentional if the actor brings about that harm either purposefully or knowingly.

(a) Purpose. An actor purposefully causes harm by acting with the desire to bring about that harm.

(b) Knowledge. An actor knowingly causes harm by engaging in conduct believing that harm is substantially certain to result.

[*Restatement 3d of Torts,* § 1.]

That unblending has no effect on *Millison.*

In abandoning Larson's purely subjective approach in favor of substantial certainty, we stated:

> In adopting a "substantial certainty" standard, we acknowledge that every undertaking, particularly certain business judgments, involve some risk, but that *willful employer misconduct was not meant to go undeterred.*
>
> [*Id.* at 178, 501 A.2d 505 (emphasis added).]

Put another way, we recognized that Larson's "deliberate intent to injure" standard would sweep under its protection employer conduct that the Legislature never intended to insulate. By adopting Prosser's "substantial certainty" standard, we delineated another method by which a plaintiff could prove an intentional wrong:

> It may help to perceive "substantial certainty" not so much as a substantive test itself nor as a substitute for a subjective desire to injure, [than] as a specie of evidence that will satisfy the requirement of cases such as *Bryan v. Jeffers, supra,* 103 *N.J.Super.* at 523–24, 248 A.2d 129, that "deliberate intention" be shown.
>
> [*Ibid.*]

Although noting in *Millison* that we were not repudiating earlier decisions like *Bryan* and *Arcell,* by identifying our holding as a logical "development" of the law we stated implicitly what was obvious: that *Bryan* and *Arcell* had been modified to the extent that an intentional wrong can be shown not only by proving a subjective desire to injure, but also by a showing, based on all the facts and circumstances of the case, that the employer knew an injury was substantially certain to result.

In addition to adopting Prosser's "substantial certainty" test relative to conduct, in *Millison* we added a crucial second prong to the test:

> Courts must examine not only the conduct of the employer, but also the context in which that conduct takes place: may the resulting injury or disease, and the circumstances in which it is inflicted on the worker, fairly be viewed as a fact of life of industrial employment, or is it rather plainly beyond anything the legislature could have contemplated as entitling the employee to recover *only* under the Compensation Act?
>
> [*Id.* at 179, 501 A.2d 505.]

By the addition of the context prong, *Millison* required courts to assess not only whether the employer acted with knowledge that injury was substantially certain to occur, but also whether the injury and the circumstances surrounding it were part and parcel

of everyday industrial life or plainly outside the legislative grant of immunity. In other words, under *Millison*, if only the conduct prong is satisfied, the employer's action will not constitute an intentional wrong within the meaning of *N.J.S.A.* 34:15–8. That standard will be met only if both prongs of *Millison* are proved.

Applying the newly adopted standard to the facts in *Millison*, we concluded, with respect to the defendant employer, that

> count one of plaintiffs' complaints seeking damages beyond those available through workers' compensation for their initial work-related occupational diseases must fall. Although defendants' conduct in knowingly exposing plaintiffs to asbestos clearly amounts to deliberately taking risks with employees' health, as we have observed heretofore the mere knowledge and appreciation of a risk—even the strong probability of a risk—will come up short of the "substantial certainty" needed to find an intentional wrong resulting in avoidance of the exclusive-remedy bar of the compensation statute. In the face of the legislature's awareness of occupational diseases as a fact of industrial employment, we are constrained to conclude that plaintiffs-employees' initial resulting occupational diseases must be considered the type of hazard of employment that the legislature anticipated would be compensable under the terms of the Compensation Act and not actionable in an additional civil suit.

> [*Millison, supra,* 101 *N.J.* at 179, 501 *A.*2d 505.]

Regarding the defendant physicians' conduct, however, we reached a different conclusion:

> Plaintiffs have, however, pleaded a valid cause of action for aggravation of their initial occupational diseases under the second count of their complaints. Count two alleges that in order to prevent employees from leaving the workforce, defendants fraudulently concealed from plaintiffs the fact that they were suffering from asbestos-related diseases, thereby delaying their treatment and aggravating their existing illnesses. As noted earlier, du Pont's medical staff provides company employees with physical examinations as part of its package of medical services. Plaintiffs contend that although plaintiffs' physical examinations revealed changes in chest x-rays indicating asbestos-related injuries, du Pont's doctors did not inform plaintiffs of their sicknesses, but instead told them that their health was fine and sent them back to work under the same hazardous conditions that had caused the initial injuries.

> These allegations go well beyond failing to warn of potentially-dangerous conditions or intentionally exposing workers to the risks of disease. There is a difference between, on the one hand, tolerating in the workplace conditions that will result in a certain number of injuries or illnesses, and, on the other, actively misleading the employees who have already fallen victim to those risks of the workplace. An employer's fraudulent concealment of diseases already developed is not one of the risks an employee should have to assume. Such intentionally-deceitful action goes beyond the bargain struck by the Compensation Act. But for

defendants' corporate strategy of concealing diseases discovered in company physical examinations, plaintiffs would have minimized the dangers to their health. Instead, plaintiffs were deceived—or so they charge—by corporate doctors who held themselves out as acting in plaintiffs' best interests. The legislature, in passing the Compensation Act, could not have intended to insulate such conduct from tort liability. We therefore conclude that plaintiffs' allegations that defendants fraudulently concealed knowledge of already-contracted diseases are sufficient to state a cause of action for aggravation of plaintiffs' illnesses, as distinct from any claim for the existence of the initial disease, which is cognizable only under the Compensation Act.

> [*Id.* at 181–82, 501 *A.2d* 505 (emphasis added).]

The dissent in *Millison* asserted that the majority ruled on the facts of the case without any "focused attention to the details of plaintiff's allegations or explication of the substantial certainty standard." *Id.* at 195, 501 *A.2d* 505. We disagree. We view the opinion in *Millison* as fairly addressing the substantial certainty standard in connection with both of plaintiffs' claims. Indeed, with respect to the employer's actions, the Court specifically concluded that mere toleration of workplace hazards "will come up short" of substantial certainty. *Id.* at 179, 501 *A.2d* 505. Given that holding, it was unnecessary for us to address the context prong. Nevertheless, we added our belief that the Legislature viewed occupational diseases as a hazard of employment compensable under the Workers' Compensation Act and not by way of common-law suit.

Although we did not explicitly make a "substantial certainty" finding about the physicians' suppression of the truth regarding the workers' already-contracted diseases, we clearly indicated that the standard was satisfied: "[t]hese allegations go well beyond failing to warn of potentially dangerous conditions or intentionally exposing workers to the risks of disease." *Id.* at 182, 501 *A.2d* 505. That comparison represented the essential finding of substantial certainty with respect to the physicians' conduct. Having determined that the physicians knew that plaintiffs were substantially certain to be injured due to their deception, a ruling under the context prong was necessary. Contrary to our view of the employer's actions, we determined that the physicians' "fraudulent concealment" of the workers' diseases was not a fact of industrial

life and not meant by the Legislature to be immunized from suit. *Ibid.*

Recapping, a number of principles relevant to the present inquiry can be distilled from *Millison*. First, although we recognized the need for a chary interpretation of the intentional wrong exception to the Workers' Compensation bar so that the exception would not "swallow up" the rule, we clearly rejected Larson's narrow and limited approach that required subjective intention to injure. *Id.* at 177, 501 *A.*2d 505. Second, in rejecting that approach, we also declined to adopt Larson's conclusion concerning the effect of removal of a safety device. At the very least, that issue remained open after *Millison*.

Third, we adopted Prosser's substantial certainty test for intentional wrong, a test encompassing acts that the employer knows are substantially certain to produce injury even though, strictly speaking, the employer does not will that result. Fourth, although we did not repudiate *Bryan, Ashland* and *Arcell* outright, our adoption of the "substantial certainty" standard as a complement to the "subjective desire" standard governing conduct plainly modified that line of cases. Fifth, under *Millison,* in order for an employer's act to lose the cloak of immunity of *N.J.S.A.* 34:15–8, two conditions must be satisfied: (1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize.

## IV

Subsequently, in *Mabee, supra,* 316 *N.J.Super.* 218, 720 *A.*2d 342, the Appellate Division applied the *Millison* standard to reverse the grant of a motion for summary judgment by an employer in a safety device removal case. The court held that, although the alteration or removal of a safety device is not an

intentional wrong as a matter of law, a specific set of facts might, nonetheless, meet the standard. *Id.* at 231, 720 *A.*2d 342. In assessing whether summary judgment was warranted, the court pointed to the following facts of record:

> Borden knew of the substantial danger which inhered in the labeling machine without proper protective devices. It was aware that fifteen months before plaintiff's injury, another Borden employee had injured his hand in the unguarded Alfa Labeler while undertaking essentially the same cleaning procedure undertaken by plaintiff. Thereafter Borden installed a "V" shaped guard over the nip point of the machine to protect the operators. However, the "V" shaped guard was removed. Because the guard had been installed on a machine under the exclusive control of Borden, it is not a leap of logic to conclude that a Borden employee, at the direction of Borden's supervisors, removed the "V" shaped guard for whatever reason. It certainly cannot be disputed that Borden's supervisors knew that the "V" shaped guard had been removed.
>
> Eleven months before plaintiff's injury, Borden installed the Plexiglas cover. A bypass switch was installed to permit access to the machine for maintenance purposes. On the disputed facts, a jury could nevertheless conclude that a general policy was adopted by Borden allowing operators as well unimpeded access to the machine while in operation to remove excess glue without interrupting production. The switch was therefore left in "maintenance mode" at least ninety-five percent of the time to avoid shut down of the machine, and Borden personnel encouraged the operators to utilize the switch to minimize holdups in production. Thus, a factfinder could reasonably conclude that the Plexiglas guard was essentially rendered ineffectual.
>
> Moreover, although other Borden labeling machines contained "hazard" signs, the Alfa Labeler displayed no warning signs. Finally, plaintiff's expert, based on the depositions and statements of Borden personnel, opined that alteration of the safety mechanisms resulted in a "virtual certainty" that employee injuries would occur.
>
> [*Id.* at 231–32, 720 *A.*2d 342.]

Based on that record, Judge Havey, writing for the court, concluded that

> the evidential material permitted a reasonable inference that Borden knew an occurrence of injury to an operator of the machine was substantially certain when it deliberately removed one safety guard and essentially nullified the effectiveness of the second.
>
> [*Id.* at 232, 720 *A.*2d 342.]

The court in *Mabee* also analyzed the context prong of *Millison* and held that the deliberate removal of the safety device by the employer in that case, for profit and production motives, and in the face of a recent similar accident, was neither a fact of

industrial employment nor a situation the Legislature could have contemplated as falling within the immunity of the Workers' Compensation Act. *Id.* at 233, 720 *A*.2d 342. In other words, *Mabee* held that if the employee's allegations were proved, the context prong of *Millison* would be satisfied.

We fully subscribe to *Mabee's* conclusion that removal of a safety guard can meet the intentional wrong standard;[2] that such a determination requires a case-by-case analysis; that the facts of *Mabee* presented a jury issue on substantial certainty; and that, if proved, those facts would meet the context prong of *Millison*.

## V

We turn now to the case at bar. As a preliminary matter, we have concluded that summary judgment should not have been granted to AMI because discovery from Portman was incomplete. *R.* 4:11–3; *Davila v. Continental Can Co.*, 205 *N.J.Super.* 205, 500 *A*.2d 721 (App.Div.1985). We agree with Judge Lintner's observation that Portman is uniquely positioned to "shed light on what, if any, appreciation AMI had concerning the risk of injury associated with its decision" to disable the safety guard. *Laidlow, supra,* 335 *N.J.Super.* at 350, 762 *A*.2d 311. As Judge Lintner further noted:

The crucial fact is not so much what Portman did, but what he knew. Portman's knowledge, as the employer's representative, is essential to the determination of

---

[2] We view that conclusion as a logical corollary to *N.J.S.A.* 34:15–7, which declares that willful refusal by an employee to use a safety device provided by the employer bars the worker from recovering compensation benefits. To us, an employer's removal of a safety device with knowledge that it is substantially certain to injure its workers and an employee's willful refusal to use a mandated safety device with knowledge of the potential danger are simply different sides of the same coin. Thus, the very notion advanced by AMI that removal of a safety device by an employer could never constitute an intentional wrong is wholly counter-intuitive. *See also Calderon v. Machinenfabriek Bollegraaf Appingedam BV*, 285 *N.J.Super.* 623, 637, 667 *A*.2d 1111 (App.Div.1995) (noting irony in an employer's exoneration from common-law suit for removal of safety device in light of the provisions of *N.J.S.A.* 34:15–7); William A. Dreier, *Injuries to Production Workers: Reform of the Workers' Compensation Product Liability Interface*, 48 *Rutgers L.Rev.* 813, 819–20 (1996).

the employer's knowledge concerning the substantial or virtual certainty of future injury as a result of its decision to disengage the guard. It was Portman who ordered that the guard be made operational during OSHA inspections and tied off at all other times to facilitate production. When plaintiff expressed concern about safety on three separate occasions, Portman's purported responses "it was okay" and "not a problem" were at best ambiguous. Portman, perhaps more then [sic] anyone else, is the one person who could shed light on what, if any, appreciation AMI had concerning the risk of injury associated with its decision. As the employer's representative, Portman's appreciation of the danger would be imputed to the employer. *See Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 619–20, 626 *A.*2d 445 (1993). Portman's importance cannot be overstated. Precluding the discovery action against Portman prevented plaintiff from learning the information necessary to succeed *against* AMI. Neither defendant should have been dismissed pending completion of discovery of Portman's appreciation of the risk involved in tying off the guard.

> [*Ibid.* (emphasis added).]

■ Separate and apart from that error, we are satisfied that under our well-established standards for summary judgment, even without Portman's deposition, summary judgment should have been denied to AMI and the case sent to a jury on the issue of substantial certainty.

The evidence with inferences in favor of Laidlow is powerful. The rolling mill is a dangerous machine because it requires an employee to manually feed material into a nip point. Indeed, it has been held that "an employee who manually feeds material into a machine with an unguarded nip point is at great risk of great injury." *Russell v. Interim Personnel*, 135 *Ohio App.*3d 301, 733 *N.E.*2d 1186, 1190 (1999). Apparently recognizing that principle, after its purchase AMI provided a safety guard for the rolling mill. Yet, for 13 years, from 1979 to 1992 when Laidlow was injured, the guard was inactivated by AMI nearly 100% of the time the machine was in use. During that period, Laidlow and a fellow employee had experienced close calls with the nip point of the unguarded mill. Those were potentially serious accidents in which the employees' gloves were ripped off by the machine and their fingers saved only by the cloth in the gloves. Those close calls were reported to AMI to no avail. They were persuasive evidence that AMI knew not only that injury was substantially certain to occur, but also that when it did occur it would be very serious, as

Laidlow's injury turned out to be. Within the month prior to his accident, Laidlow asked his supervisor three times to restore the guard because the unguarded machine was dangerous and because new and inexperienced employees would be operating it. Nothing was ever done.

Significantly, the only time the guard was ever activated by AMI was when OSHA inspectors came. In fact, AMI systematically deceived OSHA into believing that the machine was guarded, inferentially at least, because it knew that operating the machine without the guard inevitably would cause injury and that OSHA would not allow such a dangerous condition to exist. Through its long experience with OSHA, AMI knew that if it did not deceive the inspectors it would forfeit "the speed and convenience" that, it has conceded, motivated the removal of the guard in the first place. By its deception, a jury could conclude that AMI evidenced an awareness of the "virtual" certainty of injury from the unguarded mill. Indeed, Laidlow's expert engineer reached that very same conclusion. In addition, AMI effectively precluded OSHA from carrying out its mandate to protect the life and health of AMI's workers.

■ AMI argues that the absence of prior accidents obviates a possible finding of "substantial certainty" by a jury. We disagree. To be sure, reports of prior accidents like prior "close-calls" are evidence of an employer's knowledge that death or injury are substantially certain to result, but they are not the only such evidence. Likewise, the absence of a prior accident does not mean that the employer did not appreciate that its conduct was substantially certain to cause death or injury.

> The appreciation of danger can be obtained in a myriad of ways other than personal knowledge or previous injuries. Simply because people are not injured, maimed or killed every time they encounter a device or procedure is not solely determinative of the question of whether that procedure or device is dangerous and unsafe. If we were to accept the appellee's reasoning, it would be tantamount to giving every employer one free injury for every decision, procedure or device it decided to use, regardless of the knowledge or substantial certainty of the danger that the employer's decision entailed.... It is not incumbent that a person be burned before one knows *not* to play with fire.

[*Cook v. Cleveland Electric Illuminating Co.*, 102 *Ohio App.*3d 417, 657 *N.E.*2d 356, 364 (1995) (emphasis added).]

In short, we disagree with AMI and the Appellate Division that the absence of a prior accident on the rolling mill ended any inquiry regarding intentional wrong. That is simply a fact, like the close-calls, that may be considered in the substantial certainty analysis.

Turning to the facts in this record, we are satisfied that a reasonable jury could conclude, in light of all surrounding circumstances, including the prior close-calls, the seriousness of any potential injury that could occur, Laidlow's complaints about the absent guard, and the guilty knowledge of AMI as revealed by its deliberate and systematic deception of OSHA, that AMI knew that it was substantially certain that the removal of the safety guard would result eventually in injury to one of its employees. Thus, a jury question was presented on that issue.

■ A finding that the substantial certainty prong was satisfied does not end our inquiry. Laidlow's allegations, if proved, also must satisfy the context prong of *Millison* to preclude AMI from summary judgment. We have concluded that if Laidlow's allegations are proved, however, the context prong of *Millison* would be met. Indeed, if an employee is injured when an employer deliberately removes a safety device from a dangerous machine to enhance profit or production, with substantial certainty that it will result in death or injury to a worker, and also deliberately and systematically deceives OSHA into believing that the machine is guarded, we are convinced that the Legislature would never consider such actions or injury to constitute simple facts of industrial life. On the contrary, such conduct violates the social contract so thoroughly that we are confident that the Legislature would never expect it to fall within the Worker's Compensation bar.

Our holding is not to be understood as establishing a *per se* rule that an employer's conduct equates with an "intentional wrong" within the meaning of *N.J.S.A.* 34:15–8 whenever that employer

removes a guard or similar safety device from equipment or machinery, or commits some other OSHA violation. Rather, our disposition in such a case will be grounded in the totality of the facts contained in the record and the satisfaction of the standards established in *Millison* and explicated here.

## VI

In general, the same facts and circumstances will be relevant to both prongs of *Millison*. However, as a practical matter, when an employee sues an employer for an intentional tort and the employer moves for summary judgment based on the Workers' Compensation bar, the trial court must make two separate inquiries. The first is whether, when viewed in a light most favorable to the employee, the evidence could lead a jury to conclude that the employer acted with knowledge that it was substantially certain that a worker would suffer injury. If that question is answered affirmatively, the trial court must then determine whether, if the employee's allegations are proved, they constitute a simple fact of industrial life or are outside the purview of the conditions the Legislature could have intended to immunize under the Workers' Compensation bar. Resolving whether the context prong of *Millison* is met is solely a judicial function. Thus, if the substantial certainty standard presents a jury question and if the court concludes that the employee's allegations, if proved, would meet the context prong, the employer's motion for summary judgment should be denied; if not, it should be granted.

Obviously, the proofs at trial may not track the employee's allegations. Thus, the employer may, even after a jury returns a verdict in the employee's favor regarding substantial certainty, apply to the trial court for reconsideration of the context issue based on the difference between the facts actually established at trial and what plaintiff alleged would be proved. With that possibility in mind, where the evidence is in conflict regarding the allegations relied on by the trial court for its preliminary context

evaluation, the court should secure from the jury a resolution of those conflicts by way of a carefully crafted jury verdict form.

## VII

The judgment of the Appellate Division is reversed. The matter is remanded for trial after plaintiff is afforded a reasonable opportunity to complete discovery concerning Portman.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.