919 A.2d 878 (2007)
392 N.J. Super. 45
Mary K. KIBLER and David Kibler, her husband, Plaintiffs-Appellants,
v.
ROXBURY BOARD OF EDUCATION, Louis Ripatrazone, Joseph Toohey, Kurt Weaver and Jeffrey Swinson, Defendants-Respondents/Third Party Plaintiffs,
v.
S.H., A Minor, Third Party Defendant.
Superior Court of New Jersey, Appellate Division.
Argued March 21, 2007.
Decided April 11, 2007.
*879 David H. Ironson argued the cause for appellants (Einhorn, Harris, Ascher, Barbarito, Frost & Ironson, attorneys; Thomas F. Dorn, Jr., and Mr. Ironson, Denville, on the brief).
Michael Dougherty argued the cause for respondents (Romando, Tucker, Zirulnik & Sherlock, attorneys; Mr. Dougherty, East Hanover, on the brief).
Before Judges A.A. RODRÍGUEZ, SABATINO and LYONS.
The opinion of the court was delivered by
SABATINO, J.A.D.
Pursuant to N.J.S.A. 34:15-8, the Legislature has prescribed that workers compensation is the sole remedy against an employer for a covered employee who is injured on the job, except where the employer's conduct amounts to an "intentional wrong." We are asked in this appeal to decide whether the statute's intentional-wrong exception applies to a situation where a schoolteacher is accidentally injured during the course of a fight between two students within the school.
For the reasons explained in this opinion, we affirm the Law Division's holding that a schoolteacher's claim of this nature fails the so-called "context" prong of Laidlow v. Hariton Machinery Co., 170 N.J. 602, 614-617, 790 A.2d 884 (2002), and that, under present law, workers compensation is the exclusive remedy for such an injured teacher against her employer. Consequently, we affirm the dismissal of the plaintiff's negligence lawsuit seeking damages against her school district and various employees of the district.

I.
This matter of first impression arises out of an incident at Roxbury High School on April 15, 2002. That morning plaintiff[1] Mary Kibler, an English teacher, was in the high school auditorium supervising a school assembly. While plaintiff was standing near the back of the auditorium, a student ("S.H.") suddenly bolted out of his seat, ran up the aisle, and got into an altercation with another student ("B.L."). During the course of the students' altercation, plaintiff, who was looking in the other direction, was knocked down from behind and injured. Plaintiff concedes that she was not struck intentionally.
Following the incident plaintiff and her husband filed a civil action for damages against the Roxbury Board of Education, the district's superintendent, the high school principal, two vice-principals, and various fictitious defendants associated with the school. Her complaint alleges that the defendants were "negligent, careless, reckless and/or intentional and palpably unreasonable" in failing to assure her safety in the school workplace. In particular, plaintiff faults defendants for inadequately disciplining S.H., who had a history of behavioral problems, before the altercation and, in particular, for allowing him to remain in the regular student body. Plaintiff did not sue S.H., B.L. or their guardians.[2]
*880 The record reflects that S.H. had transferred in January 2001 to the Roxbury school district, where his father resides, from another district where his mother resides.
S.H. has a troubled past. In December 2000 he was arrested on charges of aggravated assault, simple assault and resisting arrest. In August 2001 he was charged with juvenile offenses for burglary, theft and conspiracy. S.H. appeared in the juvenile court for a third time in October 2001 for possession of alcohol, disorderly conduct and resisting arrest. Although the record does not reveal the precise dispositions of these arrests, it is undisputed that S.H. was adjudicated delinquent and had been under the supervision of a probation officer, at least as of December 2001. The record indicates that several teachers at Roxbury High School, including plaintiff, were aware of and had discussed S.H.'s arrests prior to the April 15, 2002 incident. The school also received a letter from S.H.'s probation officer in February 2002 reporting that S.H. had been ordered to undergo a chemical dependency evaluation in December 2001.
Apart from his juvenile involvement, S.H. also had violated school rules and regulations on numerous occasions. During his sixteen months at Roxbury High School from January 2001 through April 2002, S.H. committed twenty-four documented infractions. These infractions mainly involved tardiness, class-cutting, smoking, going to unauthorized areas within the school, and missing assigned detentions. One more serious incident involved S.H. "trashing" a school bus.
Two of S.H.'s disciplinary infractions resulted in his suspension from school. First, on October 12, 2001, S.H. broke into the school after hours during a football game. He was suspected of drinking and was detained by police, who he resisted during the course of arrest. S.H. was given a ten-day out-of-school suspension, and had to appear in juvenile court in connection with that offense later that month.
The second incident leading to suspension occurred on November 28, 2001. That day S.H. was observed in the hallway by a vice-principal, defendant Jeffrey Swinson, arguing with another student and using profanity. Swinson escorted S.H. to his office to discuss the matter. While in the office S.H. spoke with his father on the telephone and was overheard by Swinson telling his father that he planned to "kick somebody's a**." Swinson imposed an immediate one-day suspension, directing S.H. to spend the rest of the day in the company of his father.
As a result of these behavioral problems, S.H. was evaluated by a board-certified adolescent psychiatrist. The psychiatrist, who was retained by S.H.'s father, reported in a handwritten letter to the school dated November 29, 2001 that it was his "professional opinion that [S.H.] is not at all a threat to any of his peers in school[,]" and that "[a]s [S.H.] is not a risk to others, or [him]self, he may return to school." Having received that professional assurance, school officials permitted S.H. to return to school following his one-day suspension.
*881 Unfortunately, S.H.'s behavioral difficulties persisted. He continued to accumulate disciplinary infractions, particularly missing detentions on Saturdays. However, school officials did not impose further discipline for the missed detentions other than reassigning S.H. to attend make-up sessions, apparently having been told that S.H. had obtained weekend employment.
The school district did not expel S.H. prior to the April 15, 2002 incident. Instead, it placed S.H. in a so-called "alternative school" program conducted within the high school building but taught outside of the regular class schedule. Additionally, a school counselor referred S.H. for a substance abuse assessment, which led to a recommendation that he undergo intensive out-patient treatment four times a week.
Plaintiff retained a liability expert, a retired school administrator. That expert contended that defendants were deficient in failing to enforce as to S.H. the school's own policies of progressive (i.e., increasingly severe) discipline. The expert further contended that defendants had failed to appreciate the degree of threat posed by S.H.'s continued presence in the high school, and that he should have been expelled from school prior to April 2002.
Defendants, in turn, contend that their responses to S.H.'s behavioral issues were "judgment calls." Vice-Principal Swinson noted in particular that no student had been expelled from the high school in many years. Defendants stress that none of the disciplinary infractions that S.H. committed on school grounds prior to the subject incident involved the commission of any physical violence between S.H. and another student or school employee. Defendants also rely upon the letter that the school received in November 2001 from the psychiatrist opining that S.H. did not pose a risk to the safety of himself or others.
After discovery ended, defendants moved for summary judgment. Their motion papers argued that plaintiff's exclusive remedy as to these defendants, as an injured employee covered by workers compensation, was in the Division of Workers' Compensation pursuant to N.J.S.A. 34:15-8. Defendants further argued that their actions and inactions did not trigger the statute's "intentional wrong" exception. In that regard, defendants asserted that plaintiff did not surmount either of the two required predicates under the statute's intentional-wrong exception: (a) the so-called "conduct" prong, or (2) the so-called "context" prong. See Laidlow, supra, 170 N.J. at 614-15, 790 A.2d 884.
As an alternative basis for dismissal, defendants argued that their conduct was shielded from liability under the New Jersey Tort Claims Act's immunities for discretionary decisions by public entities and public employees. See N.J.S.A. 59:2-3 (public entities) and N.J.S.A. 59:3-2 (public employees).
Plaintiff opposed the motion in all respects, emphasizing S.H.'s extensive pattern of aberrant behavior and the district's failure to adhere to its written policies of progressive student discipline.
After hearing oral argument, Judge Stephen Smith granted defendants' motion. In his statement of reasons dated April 3, 2006, Judge Smith first determined that, as to the "conduct" prong of the intentional-wrong exception, there were genuine issues of material fact concerning the foreseeability of the altercation that had injured plaintiff. The judge ruled that plaintiff had offered "legitimate arguments supported by objective evidence that could lead a reasonable jury to conclude" that defendants had "acted with knowledge that it was substantially certain *882 that a worker [plaintiff] would suffer injury[.]"
As to the "context" prong, however, Judge Smith concluded, quoting the language of Laidlow, that plaintiff had failed to demonstrate that her claimed injuries were "outside the purview of the conditions the Legislature could have intended to immunize under the Workers' Compensation bar." Id., 170 N.J. at 623, 790 A.2d 884. On that critical point, Judge Smith made the following observations:
Although fights between students may not be an everyday occurrence at Roxbury High School, student fights cannot be said to be so totally unexpected or unusual as to allow an injured teacher to recover outside of the Workers' Compensation scheme. Viewing the facts of the instant case in a light most favorable to [the] plaintiff, it is clear that the circumstances under which the fight occurred were not so egregious as to satisfy the context prong of the [Laidlow] test. Teachers are involved in a multitude of activities involving students that go far beyond the teaching curriculum. As a necessary part of their function, teachers must act as advisors, counselors, hall, bus and cafeteria monitors, and as disciplinarians. That a teacher might be injured in [his or her] multifunctional roles seems to be something the legislators must have envisioned and intended to immunize under the Workers' Compensation legislation.
Consequently, Judge Smith dismissed plaintiff's tort action.[3] This appeal followed.

II.
When it adopted the laws presently embodied in our workers' compensation statutes, N.J.S.A. 34:15-7 to -35.22, the Legislature made it the "declared public policy" of New Jersey to "preclude [] any other recovery or measure of compensation [by an injured worker] in cases governed by its terms." New Amsterdam Casualty Co. v. Popovich, 18 N.J. 218, 226, 113 A.2d 666 (1955). The statutory compensation scheme represents a "trade-off" between a worker's "prompt and automatic entitlement to benefits for work-related injuries" without having to prove the employer's fault, in exchange for the employee's surrender of "any other method, form or amount of compensation." Laidlow, supra, 170 N.J. at 605, 611, 790 A.2d 884.
In furtherance of these policies, our courts have repeatedly enforced the compensation statute's exclusivity feature, and have found the statute's intentional-wrong exception applicable in only rare and extreme factual circumstances. Crippen v. Cent. Jersey Concrete Pipe Co., 176 N.J. 397, 823 A.2d 789 (2003) (allowing a wrongful death action where the employer had failed to correct numerous "serious" OSHA violations concerning its workers' access to a gravel hopper via an unsecured wooden plank); Mull v. Zeta Consumer Products, 176 N.J. 385, 823 A.2d 782 (2003) (allowing employee to sue employer that had removed safety interlock switches, had made other dangerous alterations to a workplace machine, had experienced a prior accident with the machine, and had prior unabated OSHA violations); Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 501 A.2d 505 (1985) (applying intentional-wrong exception where proofs circumstantially showed that employer had deliberately concealed knowledge of its employee's work-related *883 disease arising from exposure to asbestos); but see Tomeo v. Thomas Whitesell Constr. Co., Inc., 176 N.J. 366, 823 A.2d 769 (2003) (concluding that employer's deactivation of a safety lever on a snow blower did not meet the "intentional wrong" exception of N.J.S.A. 34:15-8, where the snow blower still had warning labels that adequately informed the injured employee not to put his hand in the chute while its propellers were operating).
An injured worker need not establish that the employer "subjectively desired to harm him [or her]" in order to satisfy the intentional-wrong exception. Laidlow, supra, 170 N.J. at 613, 790 A.2d 884. However, the employee wishing to recover tort damages must prove two elements:
[I]n order for an employer's act to lose the cloak of immunity of N.J.S.A. 34:15-8, two conditions must be satisfied: (1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize.
[Laidlow, supra, 170 N.J. at 617, 790 A.2d 884.]
The Supreme Court first adopted this two-pronged test in Millison, supra, 101 N.J. at 179, 501 A.2d 505.
The first prong, known as the conduct prong, may present factual issues for a jury if the evidence, "when viewed in a light most favorable to the employee, . . . could lead a jury to conclude that the employer acted with knowledge that it was substantially certain that a worker would suffer injury." Laidlow, supra, 170 N.J. at 623, 790 A.2d 884. If so, the trial judge must turn to the context prong, and "determine whether, if the employee's allegations are proved, they constitute a simple fact of industrial life or are outside the purview of the conditions the Legislature could have intended to immunize under the Workers' Compensation bar." Ibid. This latter inquiry is purely a question of law for the court. Ibid.
Applying this two-part test in Laidlow, the Court determined that an employee who was seriously injured when his hand was caught in a rolling mill being operated without a safety guard could sue his employer for common-law damages. The Court found that plaintiff had raised a jury question under the conduct prong because the defendant employer had chosen to disengage the safety guard for the device. When OSHA officials inspected the workplace, defendant would have the guard placed in its proper position and then would have the guard again disengaged once the OSHA inspectors left. Id. at 608, 790 A.2d 884. The Court found these extreme facts sufficed to present a jury question on substantial certainty. Id. at 620, 790 A.2d 884.
Additionally, the Court in Laidlow was satisfied, as a matter of law, that the context prong was fulfilled. The Court observed that defendant had "deliberately remove[d] a safety device from a dangerous machine to enhance profit on production, with substantial certainty that it will result in death or injury to a worker," and also had "deliberately and systematically deceive[d] OSHA into believing that the machine [was] guarded." Id. at 622, 790 A.2d 884. The Court was satisfied that "such conduct violates the social contract so thoroughly" that it was "confident that the Legislature would never expect it to fall within the Workers Compensation bar." Ibid. *884
Here, the school setting in which plaintiff was injured, and the nature of defendants' conduct respecting S.H., are entirely different from Laidlow and other cases depicting the "intentional-wrong" exception. As the trial judge correctly recognized, teachers are often necessarily called upon to perform tasks in supervising students that have little, if any, pedagogical aspects. Teachers must at times be present to oversee students on school playgrounds and in hallways, classrooms, lunchrooms and auditoriums. In those settings where young people congregate, often in large numbers, there is invariably the prospect that a student-on-student altercation will erupt. Such altercations are not outside the realm of conduct one may anticipate from children or adolescents. We agree with the trial judge that such student fighting, while undesirable and surely to be discouraged, is within the milieu of circumstances that the Legislature would envision occurring from time to time in our schools. Although we are reluctant to label such altercations as a "fact of life,"[4] we do not perceive them as being so extreme or unusual to equate the incident that caused plaintiff's fall to an intentional wrong.
Moreover, we agree with the trial judge that the injury S.H. unintentionally inflicted upon plaintiff was not beyond the scope of what the Legislature intended to be covered exclusively by workers compensation. The Legislature is surely aware that school employees occasionally may be hurt by students. Indeed, in 1983 the Legislature amended the criminal statutes to upgrade an assault on a public school teacher or administrator from simple assault to aggravated assault. See N.J.S.A. 2C:12-1(b)(5)(d).[5] Our case law, of which the Legislature is presumed to be aware, also at times has depicted harms inflicted by students upon their teachers. See, e.g., State v. Cannarella, 376 N.J.Super. 16, 868 A.2d 1141 (App.Div.2005), aff'd o.b., 186 N.J. 63, 891 A.2d 609 (2006)(assault on a private school teacher in the course of his duties).[6]
Plaintiff argues that the circumstances of this case are so egregious that they should be deemed outside of the purview of the Legislature's intended scope of the compensation laws. In particular, plaintiff highlights the school's disciplinary regulations, and contends that defendants should have expelled S.H. before he ran into her *885 in the auditorium. As a matter of policy, plaintiff asserts that her tort action is a necessary tool to assure the physical safety of her and other teachers.
We surely are not indifferent to the safety of the dedicated professionals who work, day in and day out, to educate our children. We also appreciate how, in hindsight, one might believe that defendants should have taken swifter or more severe action to discipline S.H. Nonetheless, we do not regard the incident before us as an event that "violates the social contract so thoroughly", see Laidlow, supra, 170 N.J. at 622, 790 A.2d 884, to overcome the compensation law's strong presumption of exclusivity. A teacher could just as easily been knocked down by a normally well-behaved student who was running in the hallway, turned the corner without looking where he or she was going, and collided with the teacher.
Further, the behavioral issues involving a troubled adolescent such as S.H. involve highly sensitive and difficult disciplinary issues that generally warrant a degree of deference to school administrators. Expulsion is a very drastic sanction, and defendants did appear to have attempted in numerous ways, albeit unsuccessfully, to correct S.H.'s wayward behavior.
Moreover, schools have other incentives to take measures for the protection of their teachers and staff beyond the prospect of facing common-law tort liability. For example, teachers' unions may exert pressure on school administrators to improve their practices. School districts also presumably would want to minimize accidents of this kind in order to attract and retain good teachers. They also are accountable to parents and taxpayers who rightly demand that their local schools be safe places for learning. If additional incentives than these are necessary, the Legislature is, of course, free to enact appropriate measures.
The judgment dismissing plaintiff's tort action is affirmed. In light of our disposition, we need not reach defendants' separate contentions that the trial judge improperly found a triable issue on the "conduct" prong of the statutory exception, and their invocation of Tort Claims Act immunities.
NOTES
[1] The teacher's husband, David Kibler, is a co-plaintiff in the litigation seeking damages for loss of consortium. For the sake of simplicity, our subsequent references in this opinion to "plaintiff" shall refer only to Mary Kibler.
[2] The school defendants did file a third-party complaint against S.H. for contribution and indemnity. Our record does not fully indicate the disposition of that third-party complaint, which would have been extinguished by the court's dismissal of plaintiff's claims if it had not already been resolved. The judge's order granting summary judgment dismissed all "cross-claims," but was silent as to third-party claims.
[3] Judge Smith found it unnecessary to reach defendants' discretionary immunity arguments under Title 59.
[4] As the Court stated in Laidlow, to surmount the compensation bar the conduct at issue must be both "more than a fact of life of industrial employment" and "plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize." Laidlow, supra, 170 N.J. at 617, 790 A.2d 884. Plaintiff fails the latter part of this standard, regardless of whether student fighting is or is not described as a "fact of life."
[5] Defendants also cite to bills recently introduced in the Legislature that would expand the aggravated assault provision in Title 2C to cover private schoolteachers, and that would center immunities on teachers who break up student fights. Because these bills have not been enacted into law we shall not rely upon them in our analysis.
[6] See also, Outland v. Monmouth-Ocean Educ. Serv. Comm'n, 154 N.J. 531, 543, 713 A.2d 460 (1998) (teacher disabled when she was assaulted by one of her emotionally disturbed students); State in the Interest of S.B., 333 N.J.Super. 236, 239-40, 755 A.2d 596 (App.Div.2000) (four teachers struck by a student in the course of attempting to break up an ongoing student-on-student fight); State in the Interest of S.T., 233 N.J.Super. 598, 601-02, 559 A.2d 861 (App.Div.1989) (student hit and shoved a teacher who was attempting to intervene in an ongoing fight); Pushko v. Bd. of Trustees, 202 N.J.Super. 98, 99-100, 493 A.2d 1309 (App.Div.), remanded by 102 N.J. 349, 508 A.2d 221 (1985) (on two separate occasions involving different students, teacher was punched in the mouth and struck with a cane, and was punched in the chest and threatened to be shot).