823 A.2d 789

ANNABELLE CRIPPEN, ADMINISTRATRIX AD PROSEQUENDUM AND GENERAL ADMINISTRATRIX OF THE ESTATE OF HAROLD CRIPPEN, DECEASED, PLAINTIFF–APPELLANT, v. CENTRAL JERSEY CONCRETE PIPE COMPANY, DEFENDANT–RESPONDENT, AND GALLO INDUSTRIES, INC., XYZ COMPANY, 1–100 (A FICTITIOUS NAME) AND/OR JOHN DOE (A FICTITIOUS NAME), DEFENDANTS.

Argued March 3, 2003—Decided May 22, 2003.

*Robert G. Hicks,* argued the cause for appellant (*Javerbaum Wurgaft Hicks & Zarin,* attorneys).

*Michael J. Marone,* argued the cause for respondent (*McElroy, Deutsch & Mulvaney,* attorneys; *Joseph J. McGlone* and *Richard J. Williams,* on the brief).

The opinion of the Court was delivered by

COLEMAN, J.

The critical issue in this appeal is whether an employer's conduct in failing to cure hazardous conditions in violation of a directive issued by the U.S. Department of Labor, Occupational Safety & Health Administration (OSHA), coupled with its intentional deception of OSHA, constitutes an "intentional wrong" under the exclusive remedy provision of the Workers' Compensation Act, *N.J.S.A.* 34:15–8. Based on this Court's holding in *Millison v. E.I. du Pont de Nemours & Co.,* 101 *N.J.* 161, 501 *A.*2d 505 (1985), the trial court dismissed the common-law tort claim against the employer. The Appellate Division affirmed, and upon reconsideration after our decision in *Laidlow v. Hariton Machinery Co.,* 170 *N.J.* 602, 790 *A.*2d 884 (2002), the Appellate Division reaffirmed the trial court's decision to dismiss plaintiff's intentional tort claim on summary judgment. *Crippen v. Central Jersey Concrete Pipe Co.,* 350 *N.J.Super.* 313, 795 *A.*2d 284 (2002). We disagree and reverse.

I.

This wrongful death case arises out of a workplace accident that caused the death of Harold Crippen. On June 6, 1998, Crippen was working as a "material man" in the course of his employment with defendant Central Jersey Concrete Pipe Company at its plant in Farmingdale. As a "material man," Crippen was responsible for controlling the movement of sand and gravel into loading hoppers located in an elevated shed referred to as the change-over room. Each hopper is about seventeen-feet deep and measures

eight feet by ten feet. In order to activate the lever and regulate the inflow of sand or gravel, Crippen had to walk on a single two-inch by ten-inch wooden plank and stand on a six-foot high, unsecured ladder that rested on the wooden plank. That process consumed less than two minutes and was performed approximately ten times a day. On the day of the accident, while performing those duties, Crippen fell into the sand hopper and suffocated. Crippen's body was discovered buried in the sand when a co-worker released sand from the chute at the bottom of the hopper.

On January 22, 1999, Annabelle Crippen, Administratrix ad Prosequendum and General Administratrix, filed a wrongful-death complaint against Crippen's employer. The complaint alleges that the accident was caused by the willful and wanton actions on the part of defendant, and as a result, the claim falls within the intentional wrong exception to *N.J.S.A.* 34:15–8. *N.J.S.A.* 34:15–8, commonly referred to as the "exclusive remedy provision," provides:

> Such agreement shall be a surrender by the parties thereto of their rights to any other method, form or amount of compensation or determination thereof than as provided in this article and an acceptance of all the provisions of this article, and shall bind the employee and for compensation for the employee's death shall bind the employee's personal representatives, surviving spouse and next of kin, as well as the employer, and those conducting the employer's business during bankruptcy or insolvency.
>
> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, *except for intentional wrong.*
>
> [*Ibid.*](emphasis added.)

Defendant argued successfully on its motion for summary judgment, based on *Millison*, that Crippen's work conditions did not create a substantial certainty that an injury would occur and that the death and the circumstances surrounding it fairly should be viewed as a fact of industrial employment. Plaintiff opposed the motion, arguing that an intentional wrong existed due to defendant's deliberate failure to correct OSHA violations and its fraudulent misrepresentations to OSHA that it had abated the unsafe work conditions. Additionally, plaintiff argued that the case was

not ripe for summary judgment because discovery was incomplete, claiming that OSHA's Investigation Report was neither finalized nor available for public disclosure.

The trial court granted defendant's summary judgment motion, and held that the intentional wrong exception did not apply in this case because there was no "substantial certainty" of injury. The court reasoned that although defendant had knowledge of the dangerous work environment, "it didn't mean that [defendant] knew that someone was going to get killed as a result of it."

Following the grant of partial summary judgment dismissing the intentional tort claim contained in the first count of plaintiff's complaint, plaintiff conducted further discovery demanded in the second count, in which she alleged that the manufacturer and/or seller of certain equipment might be liable under the New Jersey Products Liability Act. During that discovery, plaintiff obtained the complete OSHA file with respect to Crippen's death. The file revealed that prior to Crippen's death OSHA conducted an investigation at defendant's plant in the fall of 1996. As a result of that investigation, OSHA issued a Citation and Notification of Penalty on January 16, 1997, in which it cited defendant for, among other things: its failure to identify permit-required confined spaces[1] in accordance with 29 *C.F.R.* § 1910.146(c)(1); its failure to develop and implement a "written permit space entry program" in accor-

---

[1] Under 29 *C.F.R.* § 1910.146(b), a permit-required confined space is:

[A] confined space that has one or more of the following characteristics:

(1) Contains or has a potential to contain a hazardous atmosphere;

(2) Contains a material that has the potential for engulfing an entrant;

(3) Has an internal configuration such that an entrant could be trapped or asphyxiated by inwardly converging walls or by a floor which slopes downward and tapers to a smaller cross-section; or

(4) Contains any other recognized serious safety or health hazard.

A confined space is a space that: "(1) Is large enough and so configured that an employee can bodily enter and perform assigned work; and (2) Has limited or restricted means for entry or exit (for example, ... hoppers ... are spaces that have limited means of entry); and (3) Is not designed for continuous employee occupancy." 29 *C.F.R.* § 1910.146(b).

dance with 29 *C.F.R.* § 1910.146(c)(4);[2] its failure to implement a lockout[3]/tagout[4] procedure in accordance with 29 *C.F.R.* § 1910.147(c)(4)(i);[5] and its failure to train employees adequately on "the safe application, usage, and removal of energy control devices" in accordance with 29 *C.F.R.* § 1910.147(c)(7)(i).[6] OSHA

---

[2] This provision basically requires an employer to "[d]evelop and implement the means, procedures, and practices necessary for safe permit space entry operations" and for emergency situations affecting the permit spaces. *29 C.F.R.* § 1910.146(d).

[3] Lockout means "[t]he placement of a lockout device on an energy isolating device," ["a mechanical device that physically prevents the transmission or release of energy," to] "ensur[e] that the energy isolating device and the equipment being controlled cannot be operated until the lockout device is removed." *29 C.F.R.* § 1910.147(b). The lockout device is "[a] device that utilizes a positive means such as a lock. . ." *Ibid.*

[4] Tagout is defined as "[t]he placement of a tagout device on an energy isolating device . . . to indicate that the energy isolating device and the equipment being controlled may not be operated until the tagout device is removed." *Ibid.* Tagout device is "[a] prominent warning device, . . . , which can be securely fastened to an energy isolating device. . . ." *Ibid.*

[5] 29 *C.F.R.* § 1910.147(c)(4)(i) states that "[p]rocedures shall be developed, documented and utilized for the control of potentially hazardous energy when employees are engaged in the [control of hazardous energy (lockout/tagout)]."

[6] 29 *C.F.R.* § 1910.147(c)(7)(i) states:

(i) The employer shall provide training to ensure that the purpose and function of the energy control program are understood by employees and that the knowledge and skills required for the safe application, usage, and removal of the energy controls are acquired by employees. The training shall include the following:

(A) Each authorized employee shall receive training in the recognition of applicable hazardous energy sources, the type and magnitude of the energy available in the workplace, and the methods and means necessary for energy isolation and control.

(B) Each affected employee shall be instructed in the purpose and use of the energy control procedure.

(C) All other employees whose work operations are or may be in an area where energy control procedures may be utilized, shall be instructed about the procedure, and about the prohibition relating to attempts to restart or reenergize machines or equipment which are locked out or tagged out.

categorized those violations as "[s]erious," meaning that the condition can result in "a substantial probability [of] death or serious physical harm[,]" 29 *C.F.R.* 1960.2(v), and ordered defendant to abate them by February 18, 1997, which was approximately sixteen months prior to Crippen's death.

During the discovery, plaintiff also obtained the deposition of Charles Mason who was employed as defendant's Environmental Health and Safety Manager at the time of Crippen's death. Mason admitted that defendant failed, before the date of Crippen's accident, to abate many of the hazardous conditions cited by OSHA. Specifically, Mason testified that "[n]o real formal training" on lockout/tagout had occurred. Rather, Mason trained only five employees, not including Crippen, whose jobs involved confined space repairs or confined space procedures. Mason admitted that the confined space training program was not sufficient and that he knew an employee could die in one of the permit spaces. Mason also stated that, between January 1997 when OSHA ordered defendant to correct certain serious OSHA violations and Crippen's death in June 1998, there was no "list identifying permit required confined spaces" and that no signs were posted "identifying Confined Space Permit–Required locations." Although managers were required to take effective physical measures to keep employees out of the permit spaces, he admitted "that nothing was done to effectively keep employees from entering [the permit] spaces, such as physical barriers or warning signs." In addition, Mason testified that defendant failed to obtain the requisite harnesses and retrieval devices for permit spaces, and failed to implement a rescue procedure that conformed to OSHA's requirements. Mason stated that he, the General Manager, and the Plant Manager, intended to satisfy the OSHA citations first and finish the implementation later.

Plaintiff also acquired an expert opinion from Wayne F. Nolte, Ph.D., P.E., who performed "an engineering evaluation regarding the manner in which [defendant] attempted to comply with OSHA citations." Based on his investigation, Nolte concluded:

[Defendant] was aware of serious, hazardous and dangerous conditions in their Farmingdale plant, identified by OSHA between September 1996 and January 1997. They deliberately provided information to OSHA indicating that they were addressing each of the violations in an attempt to abate the citations. Yet, they admitted to not following through with the statements made to OSHA regarding the abatements.

[Defendant] was informed by OSHA that the area where Mr. Crippen's death occurred was a confined space and that it was also a lockout/tagout area. Mr. Crippen died because he was allowed to enter a Permit Confined Space without a permit and without having the proper lockout/tagout so that the mixer operator would not open the pneumatic gate and cause a discharge of the hopper contents. Had the "Serious" citations of violations issued by OSHA been appropriately addressed, with a serious attitude toward making the plant safe for its workers, Mr. Crippen would have had a secured ladder supported on a proper surface, and a grate separating him from the contents in the hopper. In addition, the mixer operator would have known that Mr. Crippen was in the shed on top of the hopper and would not have been able to operate the pneumatic gate to discharge the hopper contents.

. . .

Mr. Crippen's death resulted not from [defendant] not being aware of some hazardous and dangerous conditions on this site, but from their deliberate, intentional decision not to address the violations cited by OSHA and identified as "Serious." Their efforts were directed toward reducing the penalties and keeping OSHA away so they did not incur any further penalties, rather than making the plant safe and inviting OSHA back to assist them in moving toward a safe environment for their employees.

After the discovery had been completed and no basis was found to support a products liability claim, the parties agreed to dismiss the remaining count of the complaint. Plaintiff then appealed the summary judgment dismissing the intentional tort claim. In affirming the dismissal of the wrongful death claim, the Appellate Division concluded:

The OSHA citations made [defendant] aware that continued operation of the plant without abatement of the violations presented a real possibility of injury to its employees, specifically the material man. However, the evidence does not support plaintiff's assertion that injury or death was virtually certain to occur. It only indicates that "a known risk blossom[ed] into reality."

[*Crippen v. Central Jersey Concrete Pipe Co.*, 342 *N.J.Super.* 65, 74, 775 *A.2d* 716 (2001) (quoting *Millison, supra,* 101 *N.J.* at 178, 501 *A.2d* 505).]

The panel expressed its view that Mason's admission that "he knew an employee could die in one of the confined spaces if the violations were not abated" merely was evidence of defendant's awareness of the risk. *Id.* at 74–75, 775 *A.2d* 716. In addition,

the panel noted "it is difficult to argue that [defendant] knew with substantial certainty that an injury was to occur when there was no evidence of any prior accidents in which the material man had been injured." *Id.* (citing *Laidlow v. Hariton Mach. Co.*, 335 *N.J.Super.* 330, 340–41, 762 *A.*2d 311 (App.Div.2000)). The panel also ruled that further discovery was unnecessary because "[t]he additional facts do not change the conclusion that plaintiff's claims are barred under *N.J.S.A.* 34:15–8." *Id.* at 77, 775 *A.*2d 716.

We granted plaintiff's petition for certification and summarily remanded the matter to the Appellate Division for reconsideration in light of Laidlow, which was decided subsequent to the panel's decision. *Crippen v. Central Jersey Concrete Pipe Co.*, 171 *N.J.* 440, 794 *A.*2d 179 (2002). In its second reported opinion, the Appellate Division held that "*Laidlow* [did] not alter [its] prior analysis[,]" and again affirmed the trial court's decision to grant summary judgment in defendant's favor. *Crippen, supra,* 350 *N.J.Super.* at 314–15, 795 *A.*2d 284.

We granted plaintiff's second petition for certification, 174 *N.J.* 361, 807 *A.*2d 193 (2002), and now reverse.

## II.

### A.

Plaintiff argues that the Appellate Division, on remand, failed to follow this Court's directives in *Laidlow.* Plaintiff asserts that the evidence from OSHA's investigation justified a reversal of the trial court's grant of summary judgment. Plaintiff contends that the Appellate Division failed to consider Mason's testimony "in the light most favorable to the non-moving party." *Laidlow, supra,* 170 *N.J.* at 607, 620, 623, 790 *A.*2d 884. In addition, plaintiff argues that, contrary to *Laidlow, supra,* 170 *N.J.* at 621, 790 *A.*2d 884, the Appellate Division failed to consider the evidence from plaintiff's expert report.

Defendant, on the other hand, argues that the Appellate Division properly applied the principles of *Laidlow.* Defendant con-

tends that the facts do not rise to the level of an intentional wrong as they did in *Laidlow* because: (1) the record contains no evidence that defendant knew Crippen's accident was virtually certain to occur; (2) there were no prior incidents involving the hopper; (3) defendant's failure to fully implement the mandatory safety programs constitutes a mere toleration of a dangerous condition, and not an intentional wrong, *see Laidlow, supra,* 170 *N.J.* at 615, 790 *A.2d* 884; and (4) Mason's testimony demonstrates defendant's desire to comply with OSHA's directives, albeit with as little impact on defendant's business operations as possible.

### B.

Our analysis of whether Crippen's accident satisfies the "intentional wrong" exception contained in *N.J.S.A.* 34:15-8 must begin with the landmark *Millison* decision.

There, we adopted Dean Prosser's definition of an intentional wrong:

"[T]he mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent. The defendant who acts in belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great the conduct may be characterized as reckless or wanton, but it is not an intentional wrong."

[*Millison, supra,* 101 *N.J.* at 177, 501 *A.2d* 505 (quoting W. Prosser and W. Keeton, *The Law of Torts,* § 80 at 569 (5th ed.1984)).]

"[I]n adopting a 'substantial certainty' standard, we acknowledge[d] that every undertaking, particularly certain business judgments, involve [sic] some risk, but that *willful employer misconduct must not go undeterred." Millison, supra,* 101 *N.J.* at 178, 501 *A.2d* 505 (emphasis added). In assessing whether an intentional wrong was committed, we not only required courts to determine whether a "virtual certainty" of injury or death existed under the conduct prong, but we also required courts to consider the context in which the conduct takes place. *Id.* at 179, 501 *A.2d* 505. Under the context prong, we held that courts must determine whether the resulting injury or death, and the circumstances

surrounding it, fairly may be viewed as a fact of industrial life, or rather, whether it is "plainly beyond anything the legislature could have contemplated as entitling the employee to recover only under the Compensation Act[.]" *Ibid.*

In *Millison*, the employees of defendant du Pont sued du Pont and its company doctors on the grounds that they " 'intentionally injured the plaintiffs by deliberately exposing them to asbestos and aggravated these injuries by conspiring to [conceal] and fraudulently concealing from the plaintiffs knowledge of the diseases known by these defendants to have been caused by asbestos exposure and already contracted by the plaintiffs.' " *Id.* at 166, 501 *A.*2d 505 (citation omitted). The plaintiffs argued that the defendants' conduct fell within the "intentional wrong" exception to the exclusive remedy provision under *N.J.S.A.* 34:15-8. We concluded that the employer's conduct did not rise to the level of an intentional wrong:

> Although defendants' conduct in knowingly exposing plaintiffs to asbestos clearly amounts to deliberately taking risks with employees' health, as we have observed heretofore the mere knowledge and appreciation of a risk—even the strong probability of a risk—will come up short of the "substantial certainty" needed to find an intentional wrong resulting in avoidance of the exclusive-remedy bar of the compensation statute.
>
> [*Millison, supra,* 101 *N.J.* at 179, 501 *A.*2d 505.]

We also held that the plaintiffs' "initial resulting occupational diseases must be considered the type of hazard of employment that the legislature anticipated would be compensable under the terms of the Compensation Act." *Ibid.* However, with respect to plaintiffs' claim against du Pont's medical staff, the Court concluded that the plaintiffs pleaded a valid cause of action:

> There is a difference between, on the one hand, tolerating in the workplace conditions that will result in a certain number of injuries or illnesses, and, on the other, actively misleading the employees who have already fallen victim to those risks of the workplace. An employer's fraudulent concealment of diseases already developed is not one of the risks an employee should have to assume. Such intentionally-deceitful action goes beyond the bargain struck by the Compensation Act.... The legislature, in passing the Compensation Act, could not have intended to insulate such conduct from tort liability.
>
> [*Id.* at 181–82, 501 *A.*2d 505.]

Seventeen years later in *Laidlow,* we revisited our holding in *Millison* and determined whether the plaintiff was barred from pursuing an intentional tort claim against his employer. *Laidlow, supra,* 170 *N.J.* at 606, 790 *A.*2d 884. We emphasized that, under *Millison,* "an intentional wrong is not limited to actions taken with a subjective desire to harm, but also includes instances where an employer knows that the consequences of those acts are substantially certain to result in such harm." *Id.* at 613, 790 *A.*2d 884 (citing W. Prosser and W. Keeton, *The Law of Torts,* § 80 at 569 (5th ed.1984)). We reaffirmed that "in order for an employer's act to lose the cloak of immunity under *N.J.S.A.* 34:15–8," both the conduct and context prongs, established in *Millison,* must be proved. *Id.* at 617, 790 *A.*2d 884. In addition, we noted that the same facts and circumstances generally will be relevant to both prongs, but the conduct prong ordinarily is to be determined by the jury, while the context prong is a question of law for the court. *Id.* at 623, 790 *A.*2d 884.

We made clear in *Laidlow* that the absence of a prior accident does not preclude a finding of an intentional wrong. *Id.* at 621, 790 *A.*2d 884. Reports of prior accidents and "close-calls," are merely evidence "that may be considered in the substantial certainty analysis." *Id.* at 621–22, 790 *A.*2d 884. We also noted that the Court was not establishing a *per se* rule that an intentional wrong has been committed whenever an employer violates an OSHA regulation. *Id.* at 622–23, 790 *A.*2d 884.

*Laidlow* involved the use of industrial production equipment that severely injured plaintiff when his hand became caught in an unguarded rolling mill that he was operating. *Id.* at 606–07, 790 *A.*2d 884. Thirteen years before the accident, the employer had disabled a safety guard on the rolling mill and replaced it in its proper position only during OSHA inspections at the plant. *Id.* at 608, 790 *A.*2d 884. Laidlow expressed concern about the safety guard to his supervisor, Richard Portman, several times during the period immediately preceding his accident, but Portman ignored his requests to restore the guard. *Ibid.* Despite the defen-

dant's knowledge of the dangerous conditions and near-close injuries resulting from the removal of the safety guard, the defendant refused to sacrifice "speed and inconvenience" in exchange for the safety of its employees. *Id.* at 621, 790 *A.2d* 884.

Based on those facts, we held:

A reasonable jury could conclude, in light of all the surrounding circumstances, including the prior close-calls, the seriousness of any potential injury that could occur, [the plaintiff's] complaints about the absent guard, and the guilty knowledge of [the defendant] as revealed by its deliberate and systematic deception of OSHA, that [the defendant] knew that it was substantially certain that the removal of the safety guard would result eventually in injury to one of its employees.

[*Id.* at 622, 790 *A.2d* 884.]

We also concluded that if the plaintiff's allegations were proved, the context prong would be satisfied. We reasoned that:

[I]f an employee is injured when an employer deliberately removes a safety device from a dangerous machine to enhance profit and production, with substantial certainty that it will result in death or injury to a worker, and also deliberately and systematically deceives OSHA into believing that the machine is guarded, we are convinced that the Legislature would never consider such actions or injury to constitute simple facts of industrial life [and] ... would never expect it to fall within the Workers' Compensation bar.

[*Id.* at 622, 790 *A.2d* 884.]

## III.

Applying the foregoing legal tenets to this case, we conclude that a jury reasonably could conclude that defendant had knowledge that its deliberate failure to cure the OSHA violations would result in a substantial certainty of injury or death to one of its employees. First, we find that the trial court improperly granted summary judgment without permitting plaintiff to complete discovery. *Laidlow, supra,* 170 *N.J.* at 619, 790 *A.2d* 884. During the discovery that was conducted subsequent to the dismissal of the wrongful death complaint, Mason provided information that is highly relevant to the determination of whether defendant had knowledge of a substantial certainty of injury or death resulting from the safety hazards. Like Portman in *Laidlow*, Mason is in a unique position to " 'shed light on what, if any appreciation [defendant] had concerning the risk of injury associ-

ated with its decision'" not to cure the serious OSHA violations. *Ibid.* (quoting *Laidlow, supra,* 335 *N.J.Super.* at 350, 762 *A.*2d 311). Mason admitted in his deposition that he knew there was a substantial certainty that an employee could die in one of its permit-required confined spaces. That admission may be imputed to defendant because Mason, as the environmental health and safety manager at defendant's company, was testifying on defendant's behalf. *Barcello v. Biel,* 137 *N.J.L.* 606, 607, 61 *A.*2d 42 (E. & A.1948) (stating that extrajudicial admission made by employee in execution of his duty to employer is admissible against employer). Despite defendant's knowledge of the dangerous conditions found by OSHA to have existed approximately eighteen months prior to Crippen's death, defendant deliberately failed to correct the OSHA violations and intentionally deceived OSHA into believing that it had abated the violations because it did not want OSHA to return to the plant. "By its deception, a jury could conclude that [defendant] evidenced an awareness of the 'virtual' certainty of injury from" its failure to correct the safety hazards. *Laidlow, supra,* 170 *N.J.* at 621, 790 *A.*2d 884.

In addition to Mason's testimony, there is additional evidence that demonstrates the inherently dangerous conditions that existed at defendant's plant. For example, Dr. Nolte's report suggests that defendant's failure to implement properly a permit-required confined space entry program and a lockout/tagout program created a substantial certainty that an injury or death would result from the dangerous conditions of the confined spaces and energy-isolating devices in the change-over room independent of his reference to a grate that OSHA did not require until after the accident. Moreover, many of the violations OSHA found during its inspection conducted in the fall of 1996 that had not been corrected at the time of the accident were categorized as serious. Under OSHA's regulations, that translates into conditions that create a substantial probability of death or serious injury. *See* 29 *C.F.R.* 1960.2(v). Based on the totality of the circumstances, we conclude that a jury reasonably could conclude that the "substantial certainty" prong of the *Millison* test was satisfied.

Similarly, we find that plaintiff has satisfied the context prong. Defendant, contrary to OSHA's order, maintained the safety hazards that ultimately caused Crippen's death, and deliberately deceived OSHA into believing that the violations had been corrected. Defendant "effectively precluded OSHA from carrying out its mandate to protect the life and health of [defendant's] workers." *Laidlow, supra,* 170 *N.J.* at 621, 790 *A.*2d 884. We are persuaded that the Legislature never intended such conduct to constitute a part of everyday industrial life and would not expect it to fall within the Workers' Compensation bar. Consequently, summary judgment was improperly granted.

## IV.

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for trial.

VERNIERO, J., concurring.

This is a close case. I join the Court's opinion largely based on plaintiff's allegation that the defendant employer attempted to deceive federal regulators into believing that it had abated certain safety violations prior to the date of Harold Crippen's work-related death. I write separately to express my view that absent that allegation, plaintiff would not be entitled to proceed in the Law Division.

The New Jersey Workers' Compensation Act, *N.J.S.A.* 34:15–1 to –128 (the Act), seeks to protect injured workers from becoming mired in costly and protracted litigation that could delay payment of their claims. It achieves that aim by providing within its purview "the exclusive remedy for claims against an employer when a worker is injured on the job, except for those injuries that have resulted from the employer's 'intentional wrong.'" *Mull v. Zeta Consumer Prods.,* 176 *N.J.* 385, 387, 823 *A.*2d 782, 783 (2003) (quoting *N.J.S.A.* 34:15–8). In so doing, the Act embodies "an historic 'trade-off' whereby employees relinquish their right to pursue common-law remedies in exchange for prompt and auto-

matic entitlement to benefits for work-related injuries." *Laidlow v. Hariton Machinery Co.,* 170 *N.J.* 602, 605, 790 *A.*2d 884 (2002).

To vault the exclusivity bar, an injured worker must satisfy two conditions first articulated in *Millison v. E.I. du Pont de Nemours & Co.,* 101 *N.J.* 161, 501 *A.*2d 505 (1985). First, he or she must allege sufficient facts demonstrating that an employer knew that its actions were "substantially certain to result in injury or death to the employee[.]" *Laidlow, supra,* 170 *N.J.* at 617, 790 *A.*2d 884. Second, the worker must show that the circumstances surrounding the injury constituted "more than a fact of life of industrial employment" and that they were "plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize." *Ibid.*

When evaluating whether a claimant has satisfied those two conditions, we consider "the totality of the facts contained in the record[.]" *Id.* at 623, 790 *A.*2d 884. We have emphasized that an employer's mere knowledge that the workplace is dangerous does not qualify as an intentional wrong. "[T]he dividing line between negligent or reckless conduct on the one hand and intentional wrong on the other must be drawn with caution, so that the statutory framework of the Act is not circumvented simply because a known risk later blossoms into reality. We must demand a virtual certainty." *Millison, supra,* 101 *N.J.* at 178, 501 *A.*2d 505.

Here, the Occupational Safety and Health Administration (OSHA) previously cited defendant for certain safety violations described by the majority. Those violations required the employer to design and implement a compliance-abatement plan. According to the Appellate Division's initial opinion, defendant's safety manager submitted that plan to OSHA, "stating it would be implemented on March 13, 1997[,]" well over a year before Crippen's death. *Crippen v. Cent. Jersey Concrete Pipe Co.,* 342 *N.J.Super.* 65, 71, 775 *A.*2d 716 (2001). The court described defendant's subsequent failure to implement the plan as an "at-

tempt[ ] to mislead OSHA into believing that the violations had been abated[.]" *Id.* at 74, 775 *A.*2d 716.

Accepting that description, I conclude that plaintiff's allegations create at least a question of material fact to be resolved by a jury. If deception is proved, a jury could decide based on the totality of circumstances "that [defendant] evidenced an awareness of the 'virtual' certainty of injury [that could arise] from the [unabated violations]." *Laidlow, supra,* 170 *N.J.* at 621, 790 *A.*2d 884. In other words, plaintiff's allegations of deception, coupled with the other factors discussed by the majority, minimally are sufficient to entitle plaintiff to proceed in the Law Division.

Absent deception, however, this case would fall short of clearing the Act's exclusivity bar. Without that element, the circumstances here would be less compelling than those found in *Mull, supra,* in which we concluded that a lack of deception was not fatal to the worker's Law Division claim because of other factors unique to that case. 176 *N.J.* at 391, 823 *A.*2d at 786. I urge judges to keep faith with the Act by continuing to apply with rigor both prongs of the *Millison* analysis. Doing so in this appeal, I join in Justice Coleman's persuasive opinion.

Justice LaVECCHIA joins in this opinion.

ZAZZALI, J., concurring.

I concur in the judgment of the Court. I write separately from Justice Coleman's well-reasoned opinion to emphasize that an employer may be liable in intentional tort for a failure to act and to recommend abandonment of the "context prong" enunciated in *Millison v. E.I. du Pont de Nemours & Co.,* 101 *N.J.* 161, 179, 501 *A.*2d 505 (1985).

The exclusive remedy provision of the Workers' Compensation Act preserves the right of employees subject to the Act to hold an employer liable at common law for its intentional wrongs. *N.J.S.A.* 34:15–8. Over time, our courts have redefined the contours of that exception, expanding it to include not only those

cases in which an employer manifests a "deliberate intention" to injure, *Bryan v. Jeffers,* 103 *N.J.Super.* 522, 524, 248 *A.*2d 129 (App.Div.1968), *certif. denied,* 53 *N.J.* 581, 252 *A.*2d 157 (1969), but also those in which irrespective of the presence or absence of a subjective intent to injure, an employer knows that harm to an employee is "substantially certain" to result from its conduct. *Laidlow v. Hariton Mach. Co., Inc.,* 170 *N.J.* 602, 614, 790 *A.*2d 884 (2002); *Millison, supra,* 101 *N.J.* at 174, 501 *A.*2d 505. As we noted in *Laidlow, supra,* the *Restatement (Second) of Torts* provides, "[i]f the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead he is treated by the law as if he had in fact desired to produce the result." 170 *N.J.* at 613, 790 *A.*2d 884 (citing *Restatement (Second) of Torts* § 8A (1965)).

The adoption of a substantial certainty standard led this Court in *Laidlow* to require proof to a jury that an employer "acted with knowledge that it was substantially certain that a worker would suffer injury" as a prerequisite to employer liability in intentional tort. *Id.* at 623, 790 *A.*2d 884. Naturally, evidence that the employer's act actually caused injury also must be present. *See Prosser and Keeton on Torts* § 41 (5th ed. 1984)("An essential element of the plaintiff's cause of action for negligence, or for that matter any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered."). Proof of an employer's intentional tort therefore requires evidence that an employer (1) acted, (2) with knowledge that a substantial certainty of harm to an employee would result, and (3) caused the anticipated injury. In the absence of competent evidence supporting each of those three elements, an employer's motion for summary judgment will succeed. *See Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

Defendant argues that "mere toleration of a dangerous condition" falls short of an "intentional·wrong." *Ante* at 406, 823 *A.*2d at 794. I write to emphasize that consistent with the majority's

decision to predicate liability in part on defendant's "deliberate failure" to remedy OSHA violations, the requirement that an employer "act" to be liable in intentional tort may be satisfied by an omission. *Ante* at 409, 823 *A.*2d at 797. *See Travis v. Dreis & Krump Mfg. Co.*, 453 *Mich.* 149, 551 *N.W.*2d 132, 141 (1996)(interpreting phrase "deliberate act of the employer" in *M.C.L.* § 418.131(1); *M.S.A.* § 17.237(131)(1) "to encompass both commissions and omissions" because "it is more common to have a situation in which an omission leads to injury at the workplace, such as a failure to remedy a dangerous condition"); *Prosser and Keeton, supra,* § 8 ("One prerequisite of liability is that the defendant act (or fail to act when there is a legal duty to act).").

In *Laidlow*, we restated this Court's conclusion in *Millison* that "mere toleration of workplace hazards 'will come up short' of *substantial certainty." Laidlow, supra,* 170 *N.J.* at 616, 790 *A.*2d 884 (quoting *Millison,* 101 *N.J.* at 179, 501 *A.*2d 505) (emphasis added). Whether a known substantial certainty of harm exists, however, depends only on the degree of risk of which the employer is aware, and not on whether that employer has taken affirmative steps to expose an employee to that risk. *See Millison, supra,* 101 *N.J.* at 177, 501 *A.*2d 505 ("The essential question therefore becomes what level of risk-exposure is so egregious as to constitute an 'intentional wrong.' "). Liability for failure to remedy a workplace condition that an employer knows is substantially certain to cause harm can meet the "act" requirement of intentional tort, regardless of whether that conduct may be characterized as "mere toleration."

Although I agree with the majority that the context prong does not provide an appropriate basis for summary judgment in this appeal, I write also to recommend that the Court abandon use of the context prong in all cases in which an employer seeks summary judgment under *N.J.S.A.* 34:15–8. Pursuant to the context prong, a trial court may disregard evidence that an employer knowingly exposed an employee to a substantial certainty of harm simply because the trial court considers such exposure a "fact of

life of industrial employment." *Millison, supra,* 101 *N.J.* at 179, 501 *A.*2d 505. Knowing exposure of an employee to almost certain harm should never be dismissed as a "fact of life." Such actions by an employer invariably constitute a gross violation of the workers' compensation bargain. *See id.* at 174, 501 *A.*2d 505 (describing Workers' Compensation Act as "a historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries *by accident* arising out of an in the course of employment") (emphasis added). Although tragic accidental deaths and injuries are a fact of life in the workplace, knowledge that death and serious injury are substantially certain to occur should never be a commonplace.

The context prong also mandates that a trial court consider whether exposure of an employee to a known substantial certainty of harm is "plainly beyond anything that the legislature could have contemplated as entitling the employee to recover *only* under the Compensation Act." *Id.* at 179, 501 *A.*2d 505. I note, however, that *N.J.S.A.* 34:15–8 does not distinguish among intentional wrongs. It simply states that "[i]f an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, *except for intentional wrong.*" *N.J.S.A.* 34:15–8 (emphasis added). The plain language of that statute neither invites nor permits a trial court to consider whether a particular intentional wrong is to be immunized. Instead, it categorically exempts all intentional wrongs from its restriction of remedy language.

I recognize that, as one pair of commentators has noted, the context prong "provides a check on runaway liability." William A. Dreier and Lawrence N. Lavigne, *Untying the Laidlow Knot: Shifting Liability from Machine Manufacturers to Employers that Continue to Use Machines That Have Known Design Defects,* 170 *N.J.L.J.* 810, 813 (Dec. 9, 2002). I believe, however, that that

gatekeeping function is adequately discharged when the trial court inquires on an employer's motion for summary judgment whether a jury reasonably might conclude that an employer acted to injure an employee with knowledge that harm was substantially certain to occur. As the majority notes, "the same facts and circumstances generally will be relevant" to both the conduct and context prongs of *Millison*. *Ante* at 408, 823 *A*.2d at 796. Accordingly, asking whether employer conduct is a "fact of life" that the Legislature intended to immunize is superfluous to the only inquiry that *N.J.S.A.* 34:15–8 requires, namely whether an intentional wrong has occurred. This Court should not permit a trial court to bar an otherwise actionable intentional tort under the pretext that *N.J.S.A.* 34:15–8 compels that result. For the above reasons, I would abandon the context prong.

*For reversing and remanding*—Chief Justice PORITZ and Justices COLEMAN, VERNIERO, LaVECCHIA, ZAZZALI, and ALBIN—6.

*Opposed*—None.