**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3858-14T4

MEDWIN SOTO,

    Plaintiff-Appellant,

v.

ICO POLYMERS NORTH AMERICA,

    Defendant-Respondent,

and

J. PETRUCCI CO., INC., IRON HILL
CONSTRUCTION, INC., COMROE ADVANCED
POWER, INC., ALL-STATE FIRE PROTECTION,
INC. and OVERHEAD DOOR CO. OF ALLENTOWN,

    Defendants.

_____

> Argued November 30, 2016 — Decided October 11, 2017
>
> Before Judges Fuentes, Simonelli and Gooden Brown.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hunterdon County, Docket No. L-0467-10.
>
> Robert G. Daroci argued the cause for appellant.
>
> Amanda J. Sawyer argued the cause for respondent (Methfessel & Werbel, attorneys; Edward L. Thornton, of counsel and on the brief; Ms. Sawyer, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

In most cases, employees who are injured in a work-related accident may only seek compensation for their injuries under the Worker's Compensation Act (the Act), N.J.S.A. 34:15-1 to -128.5. The Act allows an employee to bring a traditional common law tort cause of action against the employer only in cases in which the employee's injuries result from the employer's "intentional wrong." N.J.S.A. 34:15-8; see also Laidlow v. Hariton Mach. Co., 170 N.J. 602, 617 (2002).

Plaintiff Medwin Soto was severely injured in a work-related accident. He filed this civil action in the Law Division against his former employer, defendant ICO Polymers North America (ICO), to recover compensatory and punitive damages.[1] The trial court granted defendant's summary judgment motion and dismissed plaintiff's complaint based on the immunity from civil liability provided to employers under the Act. We reverse.

Considering the facts in the light most favorable to plaintiff, Rule 4:46-2(c), we are satisfied a rational jury can find that at the time of the accident, defendant was aware that the conditions at the Asbury facility exposed employees like

---

[1] Plaintiff received standard workers' compensation benefits from ICO's Workers' Compensation insurance carrier.

plaintiff to a high risk of serious injury or death. A jury can also find that the accident that caused plaintiff's injuries resulted from defendant's intentional decision to abate electrical code violations found in the Asbury facility, without installing the specialized lighting and wiring required in a Class II, Division 2 hazardous facility, like the one in Asbury. Finally, the jury may reasonably infer that defendant's failure to make the required specialized electrical repairs was part of its overall cost-savings plan to relocate the Asbury facility to Allentown, Pennsylvania.

In this light, the Law Division erred in granting defendant's motion for summary judgment and dismissing plaintiff's complaint as a matter of law. Our legal analysis is informed by the following facts, which we derived from the record developed by the parties before the Law Division.

I

Defendant ICO is a global company engaged in the business of grinding plastic pellets into powder. This pulverization process creates a fine powdered dust that is both a product and a byproduct of defendant's milling operations. Many of the materials pulverized or blended at defendant's facilities are highly explosive. At all times relevant to this case, defendant's plant

in Asbury was classified as a Class II, Division 2 "hazardous location."

On July 2, 2007, approximately one year before plaintiff's accident, accumulations of combustible dust ignited in Building One in the Asbury facility. The explosion injured one employee and caused significant damage to the facility. Following the incident, a compliance officer from the Occupational Safety and Health Administration (OSHA) observed 1.5 to 2 inches of dust accumulation atop the facility's masonry walls and ceiling beams. OSHA cited defendant for violation of 29 C.F.R. 1910.22(a)(1), finding defendant's "[p]lace(s) of employment were not kept clean and orderly, or in a sanitary condition." OSHA also cited defendant for violation of 29 C.F.R. 1910.307(b), stating that defendant's "[e]quipment, wiring methods, and installations . . . were not intrinsically safe, or approved for the hazardous . . . location[.]" Defendant entered into a stipulation of settlement through which OSHA assessed a total of $7500 in penalties and defendant affirmatively stated that it had abated all violations. Defendant assured OSHA that going forward, it would comply with all of the requirements of the Occupational Safety and Health Act.

On August 15, 2007, ICO President Eric Parsons sent an email to senior managers in which he acknowledged that in accordance with regulations promulgated by OSHA and the National Electrical

Code, the Asbury plant's classification required special electrical and wiring methods. Parsons expressed particular concern for the danger associated with the presence of combustible dust in a Division 2 facility like the one in Asbury. Parsons noted that:

A Division 2 location is an area in which:

1) combustible dust, due to abnormal operations, may be present in the air in quantities sufficient to produce explosive or ignitable mixtures or

2) where combustible dust accumulations are present but are normally insufficient to interfere with the normal operation of electrical equipment or other apparatus but could as a result of infrequent malfunction of handling or processing equipment become suspended in the air or

3) which combustible dust accumulations on, in, or in the vicinity of the electrical equipment could be sufficient to interfere with the safe dissipation of heat from the electrical equipment or could be ignitable by abnormal operation or failure of electrical equipment.

Parsons admonished all ICO senior level staff that federal and state regulators "have become much more educated on the hazards associated with dust in [the] last couple of years." The regulators would be making random audits "to determine the level of compliance." Parsons advised that ICO planned to upgrade its facilities. He ended the email by noting that the facility in

Asbury, New Jersey had installed, or was in the process of installing equipment for "nuisance dust collection in the ambient and cryo areas." Parsons emphasized that:

> accumulations must be kept below 1/16" and if accumulations exceeds 1/16" systems must be shut down and cleaned. Nuisance dust collection with pickup points in the areas most likely to leak dust will be critical to keeping dust concentrations to a minimum.
>
> The information above is not a complete description of the new requirements but a taste of the big ticket items that will have to be addressed and resolved. This will need to be considered when preparing your capital budgets for 2008.

In a letter dated November 29, 2007, Paul Castiglia, defendant's Facility Safety Coordinator of the Asbury facility, formally informed an inspector of the New Jersey Department of Community Affairs that defendant:

> does not plan on refurbishing building number 1 that was damaged by the fire [on] July 2, 2007. It will be designated as a warehouse and not for manufacturing. The designation of a hazard area [of] Class II Division 2, will no longer be in effect, thus not requiring an upgrade to the sprinkler system to meet the requirements of a hazardous area.

From the July 2007 fire to the July 26, 2008 accident, the evidence shows that the measures taken by management staff at the Asbury facility did not reflect any attempt to adhere to the safety standards Parsons established in his August 15, 2007 email.

Specifically, the standards included keeping dust accumulations below 1/16 of an inch. The deposition testimonies of Joseph Stangle, Production Manager and Shipping and Receiving Manager, Frederick Milford, Third Shift Supervisor, and Stuart Hillyer, Working Supervisor, all consistently maintain that no changes or upgrades actually occurred in the Asbury facility from July 2007 to July 2008.

Defendant also did not produce records documenting housekeeping measures, employee training sessions, or completed checklists that indicate employees were apprised of the importance of avoiding dust accumulation and thereafter implemented allegedly revised cleaning procedures. Defendant was only able to produce materials documenting that it conducted four safety meetings in the year following the July 2, 2007 explosion.

Kyle Kester began working as the Plant Manager at the Asbury facility in September 2000. He was the Plant Manager during both the July 2007 accident and plaintiff's July 26, 2008 accident. He continued in this capacity until the facility closed down. Kester makes clear in his deposition testimony that he did not have any input in drafting defendant's housekeeping policy, which was updated on August 9, 2007. The policy required that records be kept showing: (1) the date housekeeping inspections were conducted; (2) identification of areas of concern; (3) and what

type of corrective action was taken. The inspector was required to sign and date the document. As Plant Manager, Kester did not have any documents attesting to the implementation of the policy. In fact, Kester could not provide any information about whether this housekeeping policy was even implemented.

Keith Haddock, ICO Environmental Health and Safety Coordinator, testified that he did not receive any training or instructions on safety protocols. On his own initiative, he conducted independent research online. Third Shift Supervisor Frederick Milford testified that it was possible that the four safety meetings referenced in discovery produced by defendant were the only safety meetings defendant conducted between July 2007 and July 2008.

Plaintiff also produced the deposition testimony of several individuals who were not employed by ICO, but were nevertheless able to observe large amounts of dust while visiting the Asbury facility following the July 2, 2007 explosion. Jacob Smith, Project Manager for Iron Hill Construction Management Co., visited the facility several times before plaintiff's accident in July 2008. Smith testified that each time he was at the facility, Building Three was covered in dust. Comroe Advanced Power, Inc. Foreman William Jacquillard also visited Building Three in 2008.

He estimated that dust accumulations were more than one inch deep in certain locations:

> Half inch, three quarters of an inch. I never actually measured it, but it varied. In some places it was a quarter of an inch. In some places it might have been more than an inch. It depends on what they would do in that area. A lot of it was built up I guess after a period of time on the purlins and stuff. It's not something that happens in a short period of time. It builds up in the heavy areas.

Parsons testified that ICO began constructing a new facility in Allentown, Pennsylvania with the intent of closing the Asbury facility. The record shows that the electrical equipment installed at ICO's Allentown facility was sealed, explosion-proof, and designed to minimize contact between wiring and combustible dust. By contrast, the wiring at the Asbury facility did not have this kind of special insulation. The whole facility was electrified with conventional wire. While ICO's newer facility was constructed in compliance with Class II, Division 2 requirements, plaintiff presented competent evidence that ICO "continued production at its Asbury facility with complete disregard of its Class II, Division 2 designation."[2]

_____

[2] In contrast to the emphatic statements he made in his August 15, 2007 email, Parson testified at his deposition that he was not certain whether the Asbury facility ever received a Class II, Division 2 designation classification.

Thus, despite the assurances and commitment to safety protocols set forth in the settlement with OSHA and the objectives described in Parson's email, the record contains sufficient competent evidence from which a jury may infer that ICO intentionally failed to adhere to Class II, Division 2 electrical requirements at the Asbury facility as part of its decision to relocate to a modern, cost efficient facility.

II

On July 14, 2008, twelve days before plaintiff's accident, the New Jersey Division of Codes and Standards shut down ICO's Asbury facility for fire code violations that included a non-functioning sprinkler system, non-functioning exit door, electrical work installed without current protection, and failure to provide exit signs above exterior doors. The New Jersey Department of Community Affairs declared the building "unsafe for human occupancy" and prohibited any individuals from occupying the building "until the structure is rendered safe and secure."

To remedy the electrical code deficiencies, ICO contracted with Iron Hill Construction, who in turn subcontracted with Comroe Advanced Power, Inc. Despite the mandates of ICO's Contractor Safety Program, defendant failed to instruct its contractor or its subcontractor to install the necessary lighting and wiring in accordance with Class II, Division 2 requirements.

A-3858-14T4

Gregory Ruhnke, the principal owner of Comroe Advanced Power, Inc., testified in his deposition that no one from ICO ever indicated to him that any of the electrical work at the Asbury facility needed to be done under special requirements because of the nature and classification of the facility. The Comroe invoice documenting the work states that it: "provided new temporary emergency lighting and made existing emergency lighting operational as instructed by New Jersey code officials." Finally, Comroe's foreman William Jacquillard testified at his deposition that no one from ICO informed him that the area where the explosion occurred that injured plaintiff was classified as a Class II, Division 2 hazardous location. Jacquillard stated:

> . . . I was told that they were moving. As far as what I was told, I didn't think the company was going to be functioning there. It was so that they could get there stuff out and get the building back open so they could move out. I didn't - - I was under the impression by what I was told that there were not going to function as a company there anymore. So, I don't know if any of that applies to your question, but that's what I was told, so - -
>
> Q. Are you familiar with some of those special methods that I just mentioned to you, the dust ignition proof and dust tight, are you familiar with those things?
>
> A. Yes.
>
> Q. Were any of those special wiring methods employed or utilized by Comroe for any of the

electrical work or wiring work that was done at ICO between July 14, 2008 and July 26, 2008?

A. No, sir.

In a letter dated July 15, 2008, Parsons notified the Department of Community Affairs that ICO would be ceasing production at its Asbury facility "on or before October 15, 2008." In a Supplementary Investigation Report filed by Detective Kristen Larsen of the Hunterdon County Prosecutor's Office on July 29, 2008, it is noted that ICO was permitted to reopen the Asbury plant on July 17, 2008.

On July 26, 2008, at approximately 5:52 a.m., a powerful dust explosion occurred in Building Three of ICO's Asbury facility. Plaintiff recalls experiencing two blasts within quick succession,[3] at least one of which propelled burning powders onto his body and clothing. The fire quickly spread throughout the building's interior. The Bloomsbury Fire Department did not gain control of the fire until 8:14 a.m. Fire Departments from the neighboring communities of Stewartsville, Lebanon, High Bridge, Quakertown, Clinton, Pattenburg, and Asbury worked in unison to provide additional assistance.

---

[3] According to a report prepared by plaintiff's expert to determine the origin of the fire: "A secondary explosion typically occurs when trapped dust is shaken loose in a super heated environment."

Plaintiff sustained second and third degree burn-related injuries over twelve percent of his body.  Another ICO employee received superficial burns and refused medical treatment at the scene.  New Jersey State Police documented extensive damage to the building's structure.  Principal Fire Inspector Charles F. Wian deemed the facility an imminent threat and immediately ordered that it be shut down.  ICO never resumed operations at the Asbury location.

Several governmental agencies investigated the explosion. The New Jersey State Police and the Hunterdon County Prosecutor's Office investigated to determine if there was any criminal activity.  The New Jersey Department of Community Affairs and OSHA investigated to determine whether the accident was caused, in whole or in part, by violations of state and/or federal workplace-safety laws.  Plaintiff's counsel also retained a number of professionals and experts in this field who provided reports containing their opinions as to the cause of the explosion and fire.

Detective Jessica Melendez of the Hunterdon County Prosecutor's Office opined that the fire's "exact point of origin [could] not be determined."  However, Detective Melendez acknowledged the possibility that "the electrical wiring for the newly installed exit signs" could have initiated the explosion.

Detective Michael Agens of the New Jersey State Police, Arson/Bomb Unit, similarly opined that the fire's ignition source was undetermined. He was unable to rule out a "multitude of ignition sources[.]"

Kenneth Kendrac, a certified fire investigator retained by plaintiff's counsel, opined that the fire originated in the area where Comroe had previously installed exit signs and emergency lights. As Kendrac explained in his written report:

> Based upon my review of all materials including investigation reports, photographs, deposition testimony and based on a process of elimination, I have concluded that the obvious source of ignition for the dust explosion on July 26, 2008 was the newly installed emergency lighting/exit sign that was performed by Comroe in the days prior to the explosion.

A report prepared by plaintiff's other expert, Duvall Professional Services, P.C., concurs with the conclusions reached by Kendrac:

> The following report will show that the electrical work performed just prior to the fire and explosion was the probable cause, and that the work was performed in violation of applicable codes. . . . Review of the documentation and analysis of the photographs . . . reveal a point of origin of the fire at the exit sign over the exit door next to the electrical switchgear room. The photographs clearly show improper and unsafe equipment and improper installation.

Investigators have characterized the incident as a dust explosion. After the fire was extinguished, investigators noted

14                                                    A-3858-14T4

heavy coatings of plastic dust in Building Three. State Police Detective Varick observed that dust was "[p]retty much on every surface" inside the facility. Fire Sub-code Official Jerry Velardi inspected the facility on July 28, 2008. He also noted that "[t]he entire facility was covered with dust." Principal Fire Inspector Charles Wian stated in his deposition that he observed dust "[o]n the sprinkler heads, the floor, the walls, the locker room[,]" and "[u]nder the office area." Finally, OSHA's investigation revealed that the fireball which injured plaintiff formed when Class II dusts ignited within the facility.

On December 9, 2008, OSHA cited ICO for a repeat violation of 29 C.F.R. 1910.22(a)(1). OSHA found that ICO's place of employment was "not kept clean and orderly, or in a sanitary condition[,]" and that as a result, "[m]icronized powders" were allowed to accumulate and ignite, thereby injuring plaintiff. In a subsequent stipulation of settlement, OSHA agreed to assess penalties in the amount of $12,500.

III

We review a grant of summary judgment applying the same standard used by the trial court. Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016). That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate

> inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion." <u>R.</u> 4:46-2(c); <u>see</u> <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 <u>N.J.</u> 520, 540. On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted. <u>R.</u> 4:46-2(c); <u>see</u> <u>Brill</u>, <u>supra</u>, 142 <u>N.J.</u> at 540.

> [<u>Ibid.</u>]

The Act represents our State's "historic trade-off" to provide employees guaranteed and swift reduced compensation following a workplace injury, regardless of fault, in exchange for relinquishing certain rights. <u>Millison v. E.I. Du Pont de Nemours & Co.</u>, 101 <u>N.J.</u> 161, 174 (1985). A party who expressly or implicitly accepts the Act's provisions is barred from pursuing common law remedies unless the party can show that his or her employer committed an "intentional wrong." <u>Id.</u> at 169; <u>see</u> <u>N.J.S.A.</u> 34:15-8. Although the Legislature did not intend the workers' compensation system to insulate employers from common law liability for all willful misconduct short of deliberate assault and battery, the scheme contemplates that as many claims as possible be processed exclusively within the Act. <u>Millison</u>, <u>supra</u>, 101 <u>N.J.</u> at 177.

In order to show an intentional wrong, a plaintiff must show his or her employer acted with "substantial certainty" that injury

or death would result. Van Dunk v. Reckson Assocs. Realty Corp., 210 N.J. 449, 451 (2012). "[M]ere knowledge and appreciation of a risk" is insufficient. Millison, supra, 101 N.J. at 179. For this reason, the finding of an OSHA violation in the wake of a workplace accident is not dispositive of whether an employer committed an intentional wrong. Laidlow, supra, 170 N.J. at 622—23. Such a finding is one factor to be considered among a totality of the circumstances. Van Dunk, supra, 210 N.J. at 469.

In addition to showing an employer's knowledge that its actions were substantially certain to result in injury or death, the resulting injury must be "more than a fact of life of industrial employment" and "plainly beyond anything the Legislature [would have] intended [the Act] to immunize." Id. at 462 (quoting Laidlow, supra, 170 N.J. at 617). Deciding whether the so-called "context prong" is met is solely a judicial function. Laidlow, supra, 170 N.J. at 623. Thus, a trial court should deny an employer's motion for summary judgment if the substantial certainty standard presents a jury question and the court concludes that the plaintiff's allegations would meet the context prong if proven true. Ibid.

In Laidlow, the Court was asked to decide whether an employer committed an intentional wrong when it deceived safety inspectors by disengaging and re-engaging the safety mechanisms on a dangerous

piece of equipment.  Id. at 606.  In 1979, defendant installed a safety guard on its rolling mill.  Id. at 608.  From that date until the plaintiff's injury in 1992, the employer kept the guard in place only when OSHA inspectors were physically present at its plant.  Ibid.  Prior to the injury at issue, two employees reported incidents in which their hands were nearly pulled into the machine.  Id. at 607—08.  The plaintiff's injury occurred in a manner similar to that of the previously reported incidents.  Ibid.  In determining that Millison's "substantial certainty" test had been met, the Court cited "the prior close-calls, the seriousness of any potential injury that could occur, [the plaintiff's] complaints about the absent guard, and the guilty knowledge of [defendant] as revealed by its deliberate and systematic deception of OSHA."  Id. at 622.

In Mull v. Zeta Consumer Products, 176 N.J. 385 (2003), the plaintiff was injured while attempting to repair a machine at a plastic bag manufacturing facility.  Id. at 387.  Prior to the plaintiff's injury, OSHA had cited the employer for safety violations.  Id. at 392.  The defendant nevertheless removed safety devices from the machine, causing another employee to injure her hand.  Ibid.  In holding that the defendant's conduct satisfied Millison's "substantial certainty" standard, the Court found the defendant's knowledge of prior accidents, plaintiff's safety

concerns, and OSHA citations could create a substantial certainty of injury. Ibid. With respect to Millison's context prong, the Court concluded that "[t]he Legislature would not have considered the removal of the winder's safety devices, coupled with the employer's alleged knowledge of the machine's dangerous condition due to prior accidents and employee complaints, in addition to OSHA's prior violation notices, to constitute simple facts of industrial life." Id. at 392—33 (quoting Laidlow, supra, 170 N.J. at 622).

In Crippen v. Central Jersey Concrete Pipe Company, 176 N.J. 397 (2003), the plaintiff's work involved loading sand and gravel into hoppers. Id. at 399. While performing his job, the plaintiff fell into a hopper and suffocated. Id. at 400. OSHA had previously cited the defendant for several violations which had yet to be remedied at the time of the plaintiff's accident. Id. at 401—03. Furthermore, the defendant's Environmental Health and Safety Manager admitted during discovery that the hazardous conditions noted in OSHA's citations could have contributed to the plaintiff's death. Id. at 403.

The Court held that "a jury reasonably could conclude that defendant had knowledge that its deliberate failure to cure the OSHA violations would result in a substantial certainty of injury or death to one of its employees." Id. at 409. The Court also

19

found that <u>Millison</u>'s context prong was satisfied as a matter of law, in large part because the defendant deliberately ignored OSHA violations and subsequently attempted to deceive OSHA into believing that the violations had been abated. <u>Id.</u> at 411. In this regard, the Court stated that the defendant "effectively precluded OSHA from carrying out its mandate to protect the life and health of [the defendant's] workers." <u>Ibid.</u> (quoting <u>Laidlow</u>, <u>supra</u>, 170 <u>N.J.</u> at 621).

Most recently, in <u>Van Dunk</u>, the Court held that an employer's reckless conduct at a construction site failed to satisfy the substantial certainty of injury or death required for the commission of an intentional wrong. <u>Van Dunk</u>, <u>supra</u>, 210 <u>N.J.</u> at 471. However, the Court distinguished the salient facts in that case from the more egregious circumstances which it had previously found to defeat an employer's motion for summary judgment:

> What distinguishes <u>Millison</u>, <u>Laidlow</u>, <u>Crippen</u>, and <u>Mull</u> from the present matter is that those cases all involved the employer's affirmative action to remove a safety device from a machine, prior OSHA citations, deliberate deceit regarding the condition of the workplace, . . . knowledge of prior injury or accidents, and previous complaints from employees. . . . <u>In particular, this Court was mindful in those cases of the durational aspect of the employer's intentional noncompliance with OSHA requirements or other demonstrations of a longer-term decision to forego required safety devices or practices</u>.

[<u>Ibid.</u> (emphasis added) (citations omitted).]

Our Supreme Court's history of wrestling with the nuances of this standard, as applied in a variety of factual settings, has bequeathed us the analytical tools to guide our discussion of the key facts in this case. Here, the motion judge erred because he failed to give plaintiff the benefit of all legitimate inferences that can be drawn from the evidence amassed by the parties. When viewed in the light most favorable to plaintiff, the evidence can support a jury verdict finding defendant intentionally exposed plaintiff to a work environment that carried substantial certainty of injury or death. The evidence shows defendant failed to take the corrective action required to render the Asbury facility in compliance with the standards articulated by its own President, Eric Parsons, as reflected in his August 15, 2007 email.

Defendant affirmatively promised to abate any OSHA violations outstanding at the time of the July 2, 2007 explosion. However, the evidence shows defendant continued to allow combustible dust to accumulate in hazardous amounts on various surfaces of the Asbury facility. Defendant repeatedly asserted that it would improve housekeeping by implementing a hazard communication system and increasing the frequency of its employee safety training sessions. Conspicuously missing from the record, however, is

documentary evidence showing these safety protocols were actually implemented and consistently followed.

The record is also unclear as to whether defendant did anything to upgrade its two-tiered dust collection system between the explosions on July 2, 2007 and July 26, 2008. Defendant only described its nuisance dust system and its central vacuum system, both of which were in place at the time of the July 2, 2007 explosion. A reasonable jury can find defendant deliberately deceived OSHA into believing these improvements were being implemented, when in fact defendant had already made the business decision to shut down the Asbury facility and relocate to Allentown, Pennsylvania. Finally, plaintiff produced sufficient evidence from which a jury can infer that defendant's decision to install non-conforming electrical equipment days before the explosion that caused plaintiff's injuries is directly related to the relocation. Stated differently, a jury can find defendant engaged in a cost-benefit analysis and decided it was more economically sound to place plaintiff at substantial risk of serious injury or death than to repair the Asbury facility's electrical system in accordance with the enhanced safety standards.

For these reasons, we reverse the trial court's decision to grant defendant's motion for summary judgment and remand this case for further proceedings consistent with this opinion.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3858-14T4